**In re James R. OROSCO, dba Jorsco Real Estate Development and Investment Company, Debtor.**

**Bankruptcy No. 4–86–01970–C.**

United States Bankruptcy Court, N.D. California.

July 15, 1987.

A. Edward Briseno, Cooper & Shaffer, Sacramento, Cal., for Creditors Committee.

Dwight L. Munson, Griffinger, Levinson, Freed & Heinemann, San Francisco, Cal., for Bay View Savings & Loan.

Pillsbury, Madison & Sutro, Morris W. Hirsch, Scott E. Wasserman, San Francisco, Cal., for trustee.

Ronald H. Severaid, Sacramento, Cal., for C.M.S.H.-Mohanna Joint Venture.

Robert L. Hughes, Lempres & Wulfsberg, Kaiser Center, Oakland, Cal., for debtor.

Cary L. Dictor, Alborg, Bothel & Dictor, Oakland, Cal., for California First Bank.

Laurel Bennett Kirby, Turner & Sullivan, Sacramento, Cal., for Robert B. and Julia A. Griffin.

Harvey L. Leiderman, Landels, Ripley & Diamond, San Francisco, Cal., for Commercial Center Bank.

Sybil Cook, Jacob Blea, III, Eskanos & Adler, Oakland, Cal., pro se.

Charles A. Duck, Santa Rosa, Cal., Trustee.

## MEMORANDUM RE CONFIRMATION

EDWARD D. JELLEN, Bankruptcy Judge.

### I. INTRODUCTION

The confirmation hearing in this Chapter 11 case was held June 25—July 1, 1987. The appearances for each day's proceedings were stated on the record. The debtor is the proponent of the proposed Chapter 11 Plan at issue (the "Plan"), under which the Trustee will effect an orderly liquidation of the debtor's properties over a period not exceeding five (5) years. A number of objections to confirmation were filed by secured claimants who had rejected the debtor's proposed Plan. Many of these objections were resolved by stipulation prior to conclusion of the hearing. Commercial Center Bank ("CCB"), an unsecured claimant (which also holds several secured claims) also rejected the Plan and objected to confirmation. Confirmation was supported by most of the secured claimants, the Creditors' Committee and Charles Duck, Chapter 11 Trustee.

After the close of evidence and argument, the Court announced that the Plan would be confirmed if the debtor agreed to one modification of the Plan, mentioned below, and the debtor agreed to the modification.

This memorandum is intended to evidence the Court's rulings on the issues in dispute and set forth the Court's views on two particular issues which were raised by the objections:

(1) Whether the unsecured claimants, Class Four under the Plan, accepted the Plan within the meaning of Bankruptcy Code Section 1129(a)(8)(A), and

(2) Whether the treatment of the secured claimants who rejected the Plan conforms to the requirements of Bankruptcy Code Section 1129(b)(1). The Court holds in the affirmative with respect to both of these issues.

### II. ACCEPTANCE OF PLAN BY UNSECURED CLAIMANTS

Class Four of the debtor's Plan (unsecured claims) is impaired within the meaning of Bankruptcy Code Section 1124. (All further section references herein are to the Bankruptcy Code unless otherwise indicated.) Accordingly, Section 1129(a)(8)(A) requires that such Class accept the Plan as a condition to confirmation. (The debtor will retain property under the Plan, and accordingly, may not effect a cram-down of the unsecured claimants pursuant to Section 1129(b)(2)(B).)

Section 1126(c) provides that a Plan has been accepted by a class of claims if the Plan has been accepted by creditors that hold at least two thirds in amount and more than one-half in number of the allowed claims of such class that have accepted or rejected the Plan. The parties agree that more than one-half in number of the voting claimholders have accepted the Plan. The controversy arises from two disputed claims filed by CCB in the respective sums of $373,898 and $3,057,640. CCB voted to reject the Plan. If its claims are allowable in full, or for any amount in excess of approximately $1,250,000, then the debtor has not obtained the requisite acceptances from Class Four creditors that hold at least two-thirds in amount of allowed claims in such Class which voted on the Plan.

On March 26, 1987, CCB timely filed a proof of claim in the sum of $3,057,640, plus interest, attorney's fees and costs incurred after September, 1986 (hereinafter the "Claim"). The Claim was based upon alleged violations by the debtor of a construction loan agreement dated March 18, 1985 between the claimant and the debtor, and various alleged wrongful acts by the

debtor and others in connection with the loan CCB made pursuant to the agreement. After obtaining relief from the automatic stay, CCB conducted a non-judicial foreclosure of the Deed of Trust which secured the obligations the debtor incurred pursuant to the agreement. The dollar amount of CCB's Claim consists of $1,000,000 in punitive damages, plus $2,057,640 representing the damages CCB alleges to have suffered in connection with the construction loan, as reduced by the amount of its successful credit bid at the foreclosure sale.

### A. *Waiver of Objection to Claim.*

CCB timely submitted its ballot rejecting the Plan on May 29, 1987, whereas the debtor did not file an objection to the Claim until June 17, 1987, after the ballot was filed. CCB therefore contends that the debtor has waived his right to object to the Claim for purposes of voting. This argument is not well grounded.

Pursuant to the Sections 1126(a) and (c), only the holders of allowed claims may accept or reject a proposed Plan. Pursuant to Section 502(a), a claim is deemed allowed unless a party in interest objects. It would follow that absent a Court order, holders of claims which are the subject of a pending objection may not accept or reject a proposed Plan.

Section 502(b) provides that if an objection to a claim is made, the Court is to determine the amount of the claim after notice and a hearing. Section 502(b) is supplemented by Bankruptcy Rule 3018(a), under which a disputed claim may be temporarily allowed for purposes of voting in the amount the Court deems proper after notice and a hearing. No deadline is established by the Bankruptcy Code or Rules for the filing of objections to claims, and nothing in the Code or Rules expressly prohibits the filing of an objection to a claim after a ballot has been filed.

It is clear from the foregoing that although the filing of a claim objection initially operates to preclude the claimholder from accepting or rejecting a Plan, it also triggers a right on the part of the claim-holder to request a temporary allowance for purposes of voting, and thus, to participate in the balloting process.

■ This being the case, the Court is satisfied that the mere fact that an objection to a creditor's claim is filed after the claimholder rejects a Plan, or that the immediate purpose of the objection is to obtain an Order disallowing a claim for purposes of voting, does not constitute a waiver of the objection or render the objection untimely. This is true for a number of reasons. In the first place, the above-cited provisions obviously contemplate that a Plan not be rejected or confirmed on the basis of disputed claims which are not deemed allowed, except to the extent that such claims have been temporarily allowed pursuant to Bankruptcy Rule 3018(a). Otherwise, the rights of debtors and the holders of allowable claims could be substantially and irreparably prejudiced. An automatic waiver of the type suggested by CCB would require the allowance, for voting, of a variety of objectionable claims, including claims which have been paid, or which are invalid on their face, or which are grossly inflated as to amount, or which were filed in respect of non-existent obligations. The fate of the Plan could be left to the will of the holder of a paid, inflated or fabricated claim, while the remaining parties in interest with a legitimate financial stake in the outcome of the balloting would be deprived of a practical remedy.

Secondly, a rule requiring parties in interest to review and object to claims before the balloting in order to avoid a waiver of all potential objections would not be conducive to the efficient administration of the bankruptcy case. In many Chapter 11 cases, no funds are available to pay claimants unless a Plan is confirmed. The rule suggested by CCB, however, would compel parties in interest to review claims and file objections before it is known whether any distribution can be made in respect of such claims or whether the votes by holders of claims potentially in dispute will affect the outcome of the balloting. Such a requirement would subject the estate to an unnecessary risk of needless expense. It would

also conflict with the policy embodied in Bankruptcy Code Section 704(5) (which is applicable in Chapter 11 cases pursuant to Section 1106(a)(1)), under which a Trustee is required to examine proofs of claim and object to the allowance of improper claims only "if a purpose would be served."

CCB argues that abuses may result if a plan proponent is free to disenfranchise claimholders by the mere filing of claim objections, perhaps on the eve of the confirmation hearing. The Bankruptcy Code and Rules, however, contain ample safeguards against such an abuse. Bankruptcy Rule 3018(a), mentioned above, is one of them. In addition, the victims of an attempted abuse could object to confirmation under Sections 1129(a)(2) or (3), which require the plan proponent to comply with the applicable provisions of the Bankruptcy Code and to propose the Plan in good faith and not by any means forbidden by law. They could also move pursuant to Bankruptcy Rule 9011 for sanctions or for an Order striking or temporarily disallowing the objections. If a fraud has been perpetrated, confirmation may be revoked pursuant to Section 1144. The Court could be requested to exercise its discretion to continue the confirmation hearing pending the appropriate determinations under Rule 3018(a) or to establish other procedures to protect the parties in interest. If a problem is anticipated, a motion to establish a deadline for the filing of claim objections can be made. If all else fails, the Court can be requested to exercise its equitable powers under Section 105(a).

■ In this case, there has been no abuse by the debtor. Although the objection was filed after the debtor received CCB's ballot, CCB was given ample opportunity to brief and argue its position. In-deed, the Court indicated at the first day of the confirmation hearing that the Court would make a determination concerning the allowability of CCB's disputed claim prior to the conclusion of the hearing.

The authorities cited by CCB are not persuasive, and if relevant at all, would support the debtor's position. The only Bankruptcy Code case cited by CCB is *Matter of Gardinier, Inc.*, 55 B.R. 601 (Bky.M.D.Fla.1985). In that case, the Court concluded in the context of a dispute quite similar to the one present in this case that because of a pending claim objection, the claim at issue would be disallowed for purposes of voting pursuant to Sections 1126(a) and 502(a).[1] The remaining cases cited by CCB were governed by the now repealed Bankruptcy Act and general orders issued thereunder, and have nothing to do with balloting on reorganization plans. The only one worth comment for present purposes is *In Re Autocue Sales & Distributing Corp.*, 148 F.Supp. 685 (S.D. N.Y.1957), in which the Court declined to reopen proceedings for election of a Trustee in Bankruptcy because the petitioner had raised his objections to the claims at issue after the votes had been cast, the election held, and the results announced. The Court held that the objection was untimely, but in so holding, specifically stated (at P. 687) that "[i]f the petitioner had raised objections at the time the votes had been cast, perhaps the Referee then would have been under an obligation to consider the objections and to pass upon the validity of the claim for voting purposes."

B. *Temporary Allowance Under Bankruptcy Rule 3018(a).*

■ Having concluded that the debtor did not waive his right to object to CCB's

---

1. The decision *In Matter of Gardinier, Inc.*, 55 B.R. 601 (Bky.M.D.Fla.1985) suggests, without holding, that Bankruptcy Rule 3018(a) may be in conflict with Bankruptcy Code Section 1126(a) because the Rule authorizes the temporary allowance of claims to which an objection has been filed, whereas the Code (Section 1126(a)) precludes persons other than holders of allowed claims from accepting or rejecting plans, and provides that holders of claims to which an objection has been filed do not hold allowed claims, (Section 502(a)). The conflict, if any, can be resolved through the application of Section 502(j), under which a claim which has been allowed or disallowed may be reconsidered for cause. Thus, a temporary allowance pursuant to Rule 3018(a) followed by a "nontemporary" allowance pursuant to Section 502(b) would be consistent with an allowance and a reconsideration of the allowance pursuant to Section 502(j).

Claim, the Court must make its determination pursuant to Bankruptcy Rule 3018(a) of the amount for which CCB's Claim should be temporarily allowed for purposes of voting. The matter having been briefed and argued prior to conclusion of the confirmation hearing, the Court concludes that the Claim should be temporarily disallowed in its entirety, for the following reasons:

1. Initially, CCB concedes for purposes of the present controversy only that the $1,000,000 punitive damage component of its Claim may be disallowed.

2. The remaining grounds of liability alleged in the claim are fraud and deceit, negligent misrepresentation, breach of contract, breach of covenant of good faith and fair dealing, violation of the Federal "RICO" statute entitling CCB to treble damages, conversion of loan proceeds, civil conspiracy, and diversion of funds. No attempt is made to allocate the amount of the Claim among these various alleged grounds, and no detail is provided which provides any clue concerning CCB's contentions in this regard.

3. The major factual allegations of the Claim, which are set forth in paragraphs 16 and 17 thereof, are made on "information and belief," which, in essence, means that CCB has declined to aver without equivocation that its factual allegations are true.

4. The original construction loan agreement is attached to the Claim, but nothing is attached which evidences that debtor has any liability to the claimant under any of the various theories alleged in the Claim. (See official form no. 19.)

5. The Claim alleges various wrongful acts on the part of the debtor, Merit Homes (a corporation of which debtor owns the stock), one Buzz Garcia, an architect with whom the debtor contracted, and one C. Steven Swanson, an architect hired by CCB, without any indication as to who, in particular, did what, when, or why the debtor is responsible for the alleged wrongful acts of the others (other than the conclusory statement, on information and belief, that the debtor "conspired" with them).

6. The Court cannot ascertain which portion of the damages alleged, if any, might be allowable notwithstanding CCB's nonjudicial foreclosure of its Deed of Trust. California Code of Civil Procedure Section 580d bars recovery of a deficiency judgment following foreclosure by power of sale. Although a creditor may not avoid the bar of Section 580d merely by alleging fraud on the part of the borrower, a cause of action may exist under California law if the fraud consists of waste or misrepresentations concerning the value of the property. *First Federal Savings and Loan Association v. Lehman,* 159 Cal.App.3d 537, 205 Cal.Rptr. 600 (1984); *Cornelison v. Kornbluth,* 15 Cal.3d 590, 125 Cal.Rptr. 557, 542 P.2d 981 (1975). Assuming, arguendo, that the debtor's diversion of construction loan funds would come within this exception, the Claim fails to itemize the advances which the debtor allegedly diverted and the alleged diversion is only one of numerous grounds of liability included in $2,057,640 total.

CCB notes that in 1985, the California legislature enacted Financial Code Section 779, which permits a state chartered bank such as CCB to bring and obtain judgments in certain fraud actions notwithstanding California Code of Civil Procedure Section 580d. Assuming, arguendo, that California Financial Code Section 779 is applicable to real estate loans made before its enactment and effective date (January 1, 1986), a question which the Court does not decide, CCB's claim would nevertheless fail for the reasons mentioned above. In this respect, the Court notes that most of the components of the claim are not for fraud of the type mentioned in California Financial Code Section 779, and that those components of the claim which are possibly preserved by Section 779 are subject to the flaws noted in paragraphs 3, 4, and 5, above.

At a hearing held on September 12, 1986 concerning the debtor's request to borrow certain funds from CCB on the security of a senior "priming lien" on the property which then secured its obligations, CCB advised the Court that in the event of a default, "[i]n all likelihood, there would be foreclosure by sale and no deficiency."

Debtor contends on the basis of this statement that CCB is estopped from asserting its Claim. CCB contends, in opposition, that it is not seeking a "deficiency." Rather, CCB claims it is seeking damages on the various theories set forth in its Claim, which damages equal the amount of the deficiency. At the September 12, 1986 hearing, CCB's statement was made in response to a concern the Court expressed regarding the possibility of a future default on the proposed new loan and a resulting dilution of the estate to the detriment of the unsecured claimants. In this context, the distinction between a "deficiency," on the one hand, and damages equal to the amount of the deficiency, on the other, is irrelevant.

Nevertheless, the Court cannot ascertain whether and to what extent the debtor or any other parties relied on this statement by CCB so as to give rise to an estoppel. Given the numerous reasons why CCB's claim has been disallowed for purposes of voting, the Court does not believe it necessary to resolve this question at this time and need not consider the allowability of CCB's claim in the sum of $373,898.

## III. APPROPRIATE INTEREST RATE

Under debtor's Plan, the secured claims were separately classified, appropriately so. Each class of secured claims which rejected the Plan is impaired within the meaning of Section 1124. Accordingly, the debtor has not met the requirements of Section 1129(a)(8) (requiring acceptance by each impaired class) with respect to such classes. Nevertheless, the Plan may be confirmed pursuant to Section 1129(b)(1) if the Plan is "fair and equitable" with respect to such classes within the meaning of Section 1129(b)(2)(A). That Section provides three alternative requirements which are included in the fair and equitable standard, the first of which is a two pronged test set forth in Section 1129(b)(2)(A)(i).

■ The first prong is that the Plan provide for the claimholders to retain the liens which secure their claims. Here, the Plan so provides. The second prong is that each holder receive deferred cash payments which total at least the allowed amount of claim and that the payments have a value as of the effective date of the Plan of at least the value of the holder's interest in the estate's interest in the property which secures the claim. None of the secured claimholders who rejected the Plan contend that the deferred cash payments provided by the Plan do not total at least the allowed amount of their secured claims, but many of them contend that the value of such payments is less than the value of their interest in the estate's interest in the property which secures their claims.

Originally, the Plan provided for each secured claimant to receive interest from the effective date on the amount of the claimant's allowed secured claim at a fixed rate equal to 1½% in excess of the reference rate of Bank of America NT & SA. The Plan, as finally submitted for confirmation, provides for holders of first deeds of trust to receive interest on their allowed secured claims from the effective date of the Plan at a floating rate which will initially be fixed at 1½% in excess of the reference rate of Bank of America NT & SA, as of the effective date. After the effective date, the interest rate will be adjusted annually in an amount equal to the amount of any increase or decrease over the preceding year in the cost of funds established by the Eleventh District of the Federal Home Loan Bank Of San Francisco, subject to two limitations. The first is that both increases and decreases in the rate of interest may not exceed 1% in any year. Second, the rate of interest payable by debtor may never go below the initial rate established by the Plan. The rate of interest payable to junior lien holders is initially ½% higher than the rate payable to holders of first deeds of trust, and will thereafter fluctuate in the same manner as the rate payable to senior lienholders.

Bankruptcy Code Section 1129(b)(2)(A) has been the subject of extensive case law and legislative history. The standards which the Court is required to apply are set forth in the recent decision of the Ninth Circuit Court of Appeals in *In re Camino Real Landscape Maintenance Contrac-*

*tors, Inc.,* 818 F.2d 1503 (9th Cir.1987) (*"Camino Real"*). In that case, the government had appealed three separate decisions concerning the rate of interest properly payable on deferred payments of federal taxes pursuant to Bankruptcy Code Section 1129(a)(9)(C). In affirming one of the three decisions (*Armour Oil Co.*) and reversing and remanding the other two, the Court analyzed both the case law and legislative history concerning the rates of interest payable by a debtor in a "cramdown situation."

In arriving at its conclusion, the Court stated its holding to be "that the debtor must pay the government interest at the rate the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security" and that "the Bankruptcy Court must make a case-by-case determination of what interest rate the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market." In its opinion, the Court indicated that the debtors's characteristics should determine the appropriate interest rate and that the creditor's characteristics are irrelevant. The Court also indicated that the appropriate rate should reflect the term of deferment of present use and risk of default, as affected by any security.

As of July 1, 1987, the Eleventh District rate was 7.223% (down from 7.245%, the rate which was in effect at the time the confirmation hearing commenced) and Bank of America's reference rate was 8.25%. Therefore, the initial rate of interest payable under the Plan, and the minimum rate of interest which would be payable notwithstanding any future decreases in the Eleventh District rate, would be 9.75% for first trust deed holders and 10.25% for junior lien holders. The Court finds that under the facts of this case, the standards enunciated in *El Camino* have

been met and that the debtor's Plan meets the requirements of Section 1129(b)(2)(A)(i).

Pursuant to stipulation in open Court, the Court has taken judicial notice of numerous declarations concerning the rates of interest being charged for commercial real estate loans by various lenders doing business in the Eleventh District. Although the rates obviously vary, the Court finds that the "center of gravity" of the commercial real estate loan market is a variable rate 2.25% in excess of the Eleventh District rate. Several lenders filed declarations stating their current rates were 2.5% in excess of the Eleventh District Rate. A recent survey of the rates charged by seven different savings and loan associations situated within the Eleventh District indicated that one of them established its standard rate at 2% in excess of Eleventh District rate, two had established their rate 2.15% in excess of Eleventh District rate, and that four had established their rates 2.25% in excess of Eleventh District rate.[2] It would follow that the initial rate being offered by debtor is in excess of the present market rate.

A number of the objecting secured claimants contend that if the debtor were to apply for a loan on the open market, the debtor would have to pay "points" (or a loan fee) and that the debtor must therefore pay points in order to meet the requirements of *Camino Real.* The Court disagrees. Points are generally charged to compensate a lender for the costs of processing a loan application, evaluating a loan and setting up the loan on its books. Points are generally payable at the time a loan closes. Presumably, the claimants in this case have already been compensated for these costs in accordance with their practices in effect at the time of the borrowing. Any additional costs would be compensated through payment of late charges and attorney's fees, to the extent

---

**2.** One declaration stated that the rates in the survey were for loans secured by multi-residential and not commercial properties, and that current market rates for the latter are slightly higher. No evidence was presented suggesting that market rates for a one year loan are any

different than those applicable to a five year variable interest rate loan, or that a difference in variable rates ought to exist among the secured claimants because of the varying amounts of their claims.

that such charges are allowable under Bankruptcy Code Section 506(b).

In addition, the language of the *Camino Real* opinion wherein the Court stated its holding refers, in both instances, to the "interest" rate a debtor would have to pay on the open market, and not to other loan charges such as points. Finally, and perhaps most significantly, the argument loses sight of the fact that the issue to which the *Camino Real* opinion was addressed was the appropriate standard for determining the "value" of a stream of payments, rather than the amount of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan: under the statute, the former is relevant and the latter is not.

A number of the secured claimants argue that debtor, being the subject of proceeding under Chapter 11 of the Bankruptcy Code and having the accompanying record of loan defaults, is not a qualified borrower under their standard lending practices and that this fact must be taken into account in the setting of the appropriate interest rate. In support of this contention, the creditors refer to the "debtor's characteristics" language in the *Camino Real* opinion. The Court does not read the Opinion in this manner. If this were the test, every Chapter 11 debtor would ipso facto be required to pay interest at a rate in excess of market rate without regard to the debtor's financial condition at the time of confirmation, the security, the term of deferment, or the risk of a future default, the very factors which the Ninth Circuit Court emphasized as being of primary relevance.

■ Many of the secured claimants contend that the interest rate proposed by the debtor does not adequately compensate them for the risk of nonpayment that they face, evaluated with reference to the Plan and the security. In this regard, a number of them have referred in their objections or declarations, or in their presentations to the Court at the confirmation hearing, to prior Orders of the Court entered in connection with stay relief motions. The Court has taken notice of the referenced Orders and does not believe that these arguments are well grounded. Home Savings Of America ("Home") is the holder of a first deed of trust on the real property commonly known as 16183 Ashland Avenue, San Lorenzo, CA. In its Memorandum of Decision filed March 24, 1987, this Court found that as of April 1987, the obligation owing to Home was protected by a pre-closing cost equity cushion of approximately 18% and a post-closing cost equity cushion of approximately 13%. Under the Plan, Home is to receive monthly interest payments and is to receive its principal on sale of the property but in any event, no later than the fifth anniversary of the effective date of the Plan. Appraiser Paul M. Stansky testified that the property has a low vacancy rate and two other witnesses testified that periodic rent increases of 5%–8% would be reasonable.

Secured claimant Bayview Federal Savings & Loan Association holds two separate secured obligations. The primary focus of its objection concerns the obligation it holds secured by a first deed of trust on the property located at 1510 Alamo Drive, Vacaville, CA, commonly known as the Round Oak Village Apartments. In an Order filed January 9, 1987, the Court found that the property was worth $7,300,000 (a figure the debtor disputed) to secure an obligation which was then in the sum of $5,814,155. Susan Griffin, a representative of Brighton Pacific, property manager of the property, testified that Round Oak was a "super project". Other evidence showed that because of its location in an area subject to a building moratorium and other factors, the project ought to be able to sustain periodic rent increases in excess of those projected by Bay View, and should appreciate at a rate of at least 3%—5½% per year.

Westamerica holds a first lien on the property located at 801 E. 2nd Street, Benecia, CA. The arguments presented placed the value of the property somewhere between $1,343,000 and $1,800,000. Based upon a prior court order, the Court believes that the lower valuation is the more appropriate, although some increase might be appropriate because of a favorable lease

the debtor recently negotiated. Westamerica's obligation is in the approximate sum of $927,423.00. The plan proposes the same treatment for Westamerica as that proposed for Home and Bayview.

Two other first lien holders rejected the Plan: CCB, holding a first lien on the property situated at 4563 E. 2nd Street, Benecia, CA, and Bank of America NT & SA, holding a first lien on the debtor's residence situated at 4010 Canyon Road, Lafayette, CA. The debtor is presently attempting to sell the property securing CCB's claim, and the Plan provides for payment upon sale of the property or one year after the effective date of the Plan, whichever occurs first. In the interim, interest is to accrue as mentioned above.

The Claim of Bank of America is to be paid upon sale but no later than the fifth anniversary of the date of the Plan. In the interim, the Bank will receive monthly interest payments. (Bank of America did not participate in the confirmation hearing.)

These two properties did not receive the same degree of attention at the confirmation hearing as was paid to some of the other properties. The evidence included, however, the debtor's financial projection over a five-year period which indicated the amount debtor believed the property would sell for and the amount the creditor was scheduled to receive. These projections indicated that both creditors are protected by an adequate equity cushion, and no contrary evidence was submitted.

In each of the above cases, the Court believes that the interest rate to be paid to the first lienholders is legally adequate. Each of these creditors is protected by an equity cushion and will be receiving interest at a rate in excess of current market. Many of the circumstances present here place these lenders in a position where the risks are actually less than those present in standard loans which bear a lower interest rate. For example, an experienced bonded Chapter 11 Trustee will be in control of the property serving as security and of any sales or refinances of same. The risk of the borrower commencing a new Chapter 11 case and delaying payment has been virtually eliminated (although the debtor has reserved the right to request, but not receive, a payment moratorium for cause). Ready access to a convenient forum is available in the event of a default. No sale, refinance or other major transaction can bind the property without prior notice and a hearing for the benefit of the lender and an authorizing court order. Finally, pursuant to the additional plan condition required by the Court as a condition to confirmation, in the event of a material adverse change in the value of the property after the effective date of the Plan or for other cause which might deprive the lenders of adequate protection of their obligations, the lenders are free to seek relief from the restraining order in the Plan or additional protection.

Even though the foregoing factors represent a reduction or elimination of risks to a lender that would otherwise exist in the market, the debtor is paying an initial rate of interest in excess of the rate which the Court has found to be current market rate, and has provided in the Plan that lenders will not receive interest at a rate less than that which initially goes into effect, even if market rates decline (as the Eleventh District rate has done since commencement of the confirmation hearing).

█ With reference to the junior lienholders, most of those which initially rejected the Plan have now agreed to accept the Plan on the basis of the Plan modifications proposed by the debtor. With the exception of CCB, the junior lien claimants with whom the debtor was unable to come to terms did not argue at the confirmation hearing. As to such creditors other than CCB, the Court finds that the additional half-percent of interest, when viewed with reference to the risk factors mentioned above and the evidence submitted concerning the applicable security, is sufficient to meet the requirements of the Code.

█ CCB holds a junior lien on the Ashland Avenue property mentioned above. The exact amount of its secured Claim has not been determined. Under the Plan, interest will accrue on the amount of its secured Claim and payment is to be made

upon sale of the property or five (5) years after the effective date, whichever occurs first. As is the case with all the other properties, it is the Trustee, not debtor, who is authorized to determine when the properties are to be sold and the terms of sale. The amount of CCB's obligation is relatively modest ($3,205) and the Court sees no special factors which would require that CCB receive a premium over and above the premium provided in the Plan.

## IV. OTHER FINDINGS

1. The Plan was accepted by all impaired classes of claims, except classes 6–A, 6–D, 7–A, 7–D, 8–A, 12–A, 13–A, 14–A, 16 and 19.

2. The Plan modification whereby unsecured class 5 was eliminated and the members of such class became members of unsecured class 4, did not adversely change the treatment of the claim of any creditor who did not accept the modification, and pursuant to Bankruptcy Rule 3019, shall be deemed accepted by all creditors who have previously accepted the Plan. Neither the Trustee, Creditors' Committee, or any unsecured creditor other than CCB objected to the modification. CCB's objection is frivolous because the treatment under the Plan of the creditors in former classes 4 and 5 is identical to the treatment of such creditors which was provided in the Plan as it read prior to the modification.

3. Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, except to the extent that the Plan contemplates the liquidation of the property of the estate. This issue was the subject of significant controversy and extensive testimony at the confirmation hearing. The Court has considered the testimony of the seven (7) witnesses who testified, various offers of proof, and the financial projections which the debtor introduced into evidence, and finds that the Plan is feasible and complies with the requirements of Section 1129(a)(11).

4. Each holder of a claim or interest has accepted the Plan and will receive or retain under the Plan property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. None of the unsecured claimants filed an objection to confirmation based upon this requirement, and the Trustee and Creditors' Committee stipulated with the debtor that it had been met. CCB objected to the stipulation.

The Plan provides for the unsecured claimants to receive at least 50% of their allowed claims in four installments as follows: 10% no later than the second, third and fourth anniversaries of the effective date and 20% no later than the fifth anniversary. The payments are to be funded through an orderly liquidation of the debtor's properties by the Trustee. CCB offered no explanation why the unsecured creditors would fare better through foreclosures of the debtor's properties by the senior lienholders, several of which had either obtained or calendared renewed motions for stay relief prior to the confirmation hearing. The evidence presented, including the debtor's financial projections and the Court's Order of March 24, 1987 (granting Home relief from the automatic stay effective June 30, 1987 unless a Plan was confirmed in the interim), and the quick sale value estimates provided by the debtor establish that the contrary is the case and that the debtor has satisfied Section 1129(a)(7)(A)(ii) as to class 4.

5. The Plan meets the requirements of Section 1129(a)(7)(A)(ii) as to each class of secured claims.

6. This memorandum will serve as the Court's findings of fact and conclusions of law as to the matters discussed herein, pursuant to Bankruptcy Rule 9014 and Rule 52(a), Federal Rules of Civil Procedure. Additional findings and conclusions will be set forth in a separate document and the Order Confirming Plan.