**In re VILLA DIABLO ASSOCIATES, Debtor.**

**Bankruptcy No. 92–54936–JRG.**

United States Bankruptcy Court, N.D. California.

July 2, 1993.

Michael W. Malter, David Rao, Law Offices of Binder & Malter, San Jose, CA, for debtor.

Andrew M. Gold, Sharon K. Wasserman, Stein, Lubin & Lerner, San Francisco, CA, for Citibank.

## OPINION

JAMES R. GRUBE, Bankruptcy Judge.

### I. *INTRODUCTION.*

This case involves a dispute between the debtor and its principal secured creditor over how present value should be calculated for purposes of "cramming down" a plan of reorganization under 11 U.S.C. § 1129(b).[1]

### II. *PROCEDURAL BACKGROUND.*

Villa Diablo filed its Chapter 11 petition on July 13, 1992. Its primary asset is a 48 unit apartment complex located in Concord, California. Citibank holds a note secured by a first deed of trust on the property. At the time of the filing it was owed $2,259,069. The debtor has been unsuccessfully trying to sell the property since well before the case was filed.

Seven months after the filing, in February 1993, Citibank moved for relief from the automatic stay. During these seven months the debtor was making periodic

---

1. All sections refer to Title 11 of the United States Code unless otherwise indicated.

payments to Citibank which amounted to less than half the amount necessary to service the debt. When Citibank's motion was heard, the debtor contended that it simply needed a little more time to sell the property. The court imposed a deadline, or "drop dead" date, of May 9, 1993, after which the stay would terminate. The debtor's efforts to market the property during this additional 90 day period were unsuccessful.

Due to disputes regarding the management of the property, Citibank moved, prior to the deadline, to modify the court's order so as to grant it immediate relief to foreclose. The debtor filed a counter-motion for an extension of the stay beyond the May 9th "drop dead" date. The debtor's motion asserted for the first time that it no longer wanted to sell the property, but instead intended to propose a plan which would "cram-down" the Citibank loan. The debtor asserted throughout the proceedings that the property is worth $2.6 to $2.8 million dollars, which value put Citibank in an oversecured position. However, the debtor now adopts Citibank's position that the apartment complex has never been worth more than $2,100,000. Since Citibank is owed more than this amount, it is undersecured and not entitled to interest on its secured claim. See *United Sav. Ass'n v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The debtor further asserts that all payments made during the pendency of the case should be treated as a reduction of principal.

The debtor had not actually filed a plan at the time of the initial hearing on its motion. The court therefore extended the stay through May 26th with the understanding that the stay would terminate unless the debtor had a potentially confirmable plan on file. By May 26th, the debtor had filed a plan. It was not obviously unconfirmable on its face, so the court continued the stay to the disclosure statement hearing on June 17th to give both the court and Citibank time to examine the plan.

The plan provides that Citibank will retain its lien on the property and accrue interest on its secured claim at the rate of 4.13%. The plan also provides for a minimum payment of $14,000 per month to Citibank, which calculates to an effective interest rate of 7.99% on the amount of Citibank's secured claim as calculated by the debtor. The property is to be sold within five years of confirmation. If it is not sold within five years, or if the debtor has failed to promptly cure any default, Citibank will be free to foreclose without further order of the court.

At the June 17th hearing, Citibank raised a variety of objections to the disclosure statement and plan. Among the objections was Citibank's contention that the debtor's proposed interest rate of 4.13% does not provide it with present value, and that the plan therefor fails to satisfy the fair and equitable test of § 1129(b). The debtor indicated that it might be willing to increase the interest rate but also admitted that its cash flow could not support an interest rate higher than 9%. However, in examining the cash flow from the property, it appears that if an interest rate higher than 8% is required, the debtor will not be able to confirm a plan. The court therefore severed the present value issue and set it for hearing on June 29th.

The plan and disclosure statement do not describe the manner in which the 4.13% interest rate was chosen. In its response to Citibank's objections, the debtor stated that it chose the one year Treasury Bill rate, 3.13% at the time the disclosure statement was filed, as an index to which it apparently added 1%. In a subsequent declaration filed in connection with the present value hearing, the debtor indicated that an appropriate interest rate might be in the range of 6.671% to 6.921%. This was calculated by using the Eleventh District Cost of Funds as an index and adding to that index 250 to 275 basis points.[2] Even if the debtor were to amend its plan to increase the interest rate, Citibank contends that the proposed rate is still artificially low and

---

**2.** A basis point is one-hundredth of a percent.

fails to satisfy the requirements of § 1129(b).

## III. *DETERMINING PRESENT VALUE.*

### A. *The Law In The Ninth Circuit.*

■ The Ninth Circuit has adopted a case by case market approach for determining present value payments under § 1129(a)(9)(C) or § 1129(b)(2)(A)(i)(II). *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503 (9th Cir.1987). While a market rate approach is to be utilized, two approaches have developed in the case law as to how the market rate may be found. The first approach is for the court to determine the current market interest rate for similar loans in the geographical area based upon evidence regarding such rates. From that evidence the court should evaluate the nature and quality of the collateral, the loan to value ratio, the debt coverage ratio, and other relevant risk factors to determine an interest rate the market would assign to the subject loan.

The second approach determines the market rate through the use of a formula. The Ninth Circuit has specifically approved the formula approach suggesting that the building of a formula rate is similar to the creation of a presumption which can then be tested by the introduction of evidence regarding market rates in the geographical area. *In re Fowler*, 903 F.2d 694 (9th Cir.1990). The formula approach is nothing more than an alternative procedure which can be used to determine a market rate.

If, for example, a debtor wanted to rewrite a loan for an apartment building with a loan to value ratio of 70% and a debt coverage ratio of 1.2, the first approach would make the most sense because the market has information readily available regarding the terms and conditions of such a loan including the available interest rate. But where the loan to be rewritten is outside normal underwriting criteria, such as a 100% loan to value ratio, the first approach is difficult because there is no reliable market data for comparison. The formula approach is therefore often a more useful tool in such circumstances.

The formula approach nevertheless seeks a market rate. There is no authority for the proposition that the formula approach should result in a rate more favorable to the debtor than that resulting from an examination of the marketplace. The *Camino Real* case involved tax claims of the Internal Revenue Service and the debtor's attempt to use the rate of interest on treasury obligations, that is, the rate of interest available to the federal government, as its own rate. The court pointed out: "There is no indication that Congress meant to subsidize debtors undergoing reorganization by making available to them the government's own favorable rate of interest." *Camino Real*, 818 F.2d at 1506. While the court rejected, as a "per se" rule, the Service's argument that the rate set forth in 26 U.S.C. § 6621 should be used, it acknowledged that the § 6621 rate was "clearly relevant" as long as it tracked market rates.

■ In *Fowler* the court again confirmed that market interest rates for similar loans are relevant in arriving at the appropriate interest rate under the formula approach. The court stated: "the use of a formula should be only a presumption, ... courts 'should always allow the parties to introduce evidence of market rates to rebut the presumption'." *Fowler*, 903 F.2d at 698 (*quoting* 5 Collier on Bankruptcy ¶ 1225.03[4][c] ). Simply stated, there is no authority suggesting that a Chapter 11 debtor is entitled to a more favorable interest rate than a fully qualified borrower in the marketplace.

### B. *Application Of The Formula Approach.*

■ Villa Diablo seeks to utilize the formula approach. This begins with the establishment of a "base rate" utilizing the rate on treasury obligations, the prime rate, or some other established index. The debtor now proposes to use the Eleventh District Cost of Funds as its "base rate". The Eleventh District Cost of Funds for June 1993 was 4.171%. Once the "base

rate" is established, it is then adjusted based upon several factors relating to the nature of the loan, the security, and the risk of default.

### 1. Factors affecting the base rate.

#### a. The size and term of the loan.

This factor examines the manner in which the marketplace structures loans in similar situations, that is, for similar types of properties without taking into consideration the borrower's status as a Chapter 11 debtor. Stated another way, has the debtor proposed a loan structure consistent with the practices in the marketplace?

The evidence before the court supports a finding that loans on apartment complexes of more than 37 units, secured by a first deed of trust, will generally be based on a loan to value ratio of about 70%, have a debt coverage ratio of between 1.15 and 1.3, have a term of three to ten years, and provide for a variable rate of interest. The debtor's suggested amendment to the plan involves a five year loan with a variable interest rate. This is consistent with normal practices in the marketplace, at least for the portion of the loan up to 70% of the value of the property. For this portion of the loan there is actually a market which can and should be utilized to guide the formula.

The debtor and Citibank presented a survey of rates quoted by various lenders utilizing Treasury Notes, the Eleventh District Cost of Funds, Prime and the London Interbank Offered Rates as the "base rate" index. In examining such information, one court sought what it referred to as the "center of gravity" of the commercial real estate loan market. *In re Orosco*, 77 B.R. 246, 253 (Bankr.N.D.Cal.1987). In examining the quoted rates, the court finds the "center of gravity" of the market to be 7.00%. The initial index must then be adjusted for that portion of the loan which can be measured accurately in the marketplace. The "base rate" of 4.171% thus becomes 7.00%. This is the rate that would likely be offered a qualified borrower for a similar property having a 70% loan to value

ratio and a debt coverage ratio of 1.15 to 1.3.

#### b. Whether the loan is secured.

This factor is considered because the present value concept encompasses the payment of tax obligations under § 1129(a)(9)(C) which are often unsecured. In an unsecured setting an upward adjustment is normally appropriate. This factor is also relevant in a secured setting where there is a 100% loan to value ratio.

The "center of gravity" rate of 7.00% assumes a loan to value ratio of 70%. This 30% equity cushion protects the lender against the expenses necessarily incurred in the event it must foreclose on the property. The court recognizes that if Citibank's claim is split into allowed secured and unsecured claims, the allowed secured claim will be fully collateralized at the time of confirmation.

However, confirmation does not guarantee performance under the plan. There is at least some risk of a future default which would result in Citibank incurring certain costs to realize on its collateral. This could result in Citibank's recovery being less than 100% of its allowed secured claim. The court finds that this risk of less than full recovery requires an upward adjustment of 100 basis points.

#### c. The quality of the security.

This factor examines the quality of the collateral for the loan not only at the present time, but prospectively during the term of the plan. The parties agree that the apartment complex has had a troubled past and is located in a neighborhood that has had high levels of crime and drug use. While the area shows some signs of improvement, the overall quality of the security remains in a range of average to poor. When examining the quality of the security for a loan, underwriters may add or subtract from 25 to 50 basis points to the initial rate which the court has characterized as being at the "center of gravity" of the real estate loan market. The overall quality of the security here is poor and the court finds that an increase of 50 basis points is appropriate.

#### d. *The risk of default.*

##### (1) *general factors*

Virtually every loan in a bankruptcy setting will have some risk of default. Where there is substantial equity in a property and the debtor's cash flow is strong, the risk may be slight, but such is not the case here. First, this proposed transaction involves a 100% loan to value ratio. This lack of equity increases the possibility of less than full repayment to Citibank. There is no possibility of additional borrowing on the part of the debtor. While the debtor has an investment of time and money which it hopes to recoup, it does not have existing equity to protect. This may reduce the motivation to perform over time. This additional performance risk requires an upward adjustment of 75 basis points.

The apartment complex also has a cash flow that is, at best, marginal. The debtor's April and May income statements reveal that at 100% occupancy, excluding expenses for bankruptcy counsel, the property generates between $14,000 and $14,500 per month. The debtor's plan provides for a minimum monthly payment of $14,000. In essence, the debtor proposes to give all its available monthly cash flow to Citibank as its payment. The apartment complex presently has 100% occupancy. There is no room in the debtor's proposal for a reserve for vacancies. A vacancy factor is a normal part of any projection for an apartment operation and the risk it represents is very real. There is likewise no projected cash available for deferred maintenance or emergencies. Such reserves are essential in any normal lending situation.

The debt coverage ratio normally required simply does not exist. This lack of cash reserves, and the possibility of a cash shortfall in the future requires an upward adjustment of 125 basis points.

##### (2) *effect of the confirmation process*

Citibank's expert, Price Waterhouse, indicates that the risks associated with these factors might cause a hypothetical investor to demand a rate of return of 18% to 20% for that portion of the loan exceeding 70% of value. However, creating a hypothetical investor in the marketplace is speculative and ignores the protection afforded by the confirmation process.

There is, in fact, no market which can quote terms for this portion of the loan, or any of the "cram down" loans Congress provided for in Chapters 11, 12 and 13 of the Bankruptcy Code. In essence, the structure of these loans is one created by statute with the terms to be determined, to the extent possible, in light of common practices in the marketplace. With respect to aspects of a loan for which no reliable market data is available, the underwriting function of private lenders is replaced by the protection afforded to creditors in the Code. In particular, confirmation requires that the court find a plan to be "feasible" under § 1129(a)(11) and, where a secured creditor objects, that the plan be "fair and equitable" to that creditor pursuant to § 1129(b). The confirmation process for this statutory loan scrutinizes the risks in a manner similar to that of an underwriter. Because of these stringent requirements, assuming the debtor could satisfy them, the risk of default after confirmation is not as great as Citibank would suggest. In light of the protection afforded by the confirmation process, the court believes that a reduction of 50 basis points is justified.

#### 2. *The proper rate.*

■ Based on the above analysis, the court finds that the plan would have to provide Citibank 10.00% interest on its allowed secured claim to satisfy the present value requirement of § 1129(b). The rate would also have to be adjustable at reasonable intervals to allow for fluctuations to the base of the rate, the Eleventh District Cost of Funds.

### IV. *CONCLUSION.*

■ Since the payment of present value to Citibank requires an interest rate of 10.00%, there is no possibility that the debtor can propose a feasible plan as required by § 1129(a)(11). There is, therefor, no basis for continuing to stay the termination

of the automatic stay as provided for in the court's prior order.