In re Laura Fredrika PLUMA, Debtor.

No. 02–06930–B13.

United States Bankruptcy Court,
S.D. California.

Feb. 11, 2003.

Brian M. Mahoney, Esq., American Debt Relief, San Diego, CA, for Debtor.

David L. Skelton, Trustee, San Diego, CA, Chapter 13 Trustee.

John J. Sansone, Esq., Timothy M. Barry, Esq., San Diego, CA, for County.

## MEMORANDUM DECISION

### JOHN J. HARGROVE, Chief Judge.

At issue is the rate of interest that will provide the County of San Diego ("County") with payments having a present value equal to the allowed amount of its claim as required by 11 U.S.C. § 1325(a)(5)(B)(ii).

This Court has jurisdiction to determine this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (L).

### FACTS

Laura Fredrika Pluma ("Debtor") filed her chapter 13 petition on July 16, 2002.[1] At the time of filing, Debtor was delinquent on her real property taxes (the "Taxes") in the amount of $1,932.03, including statutory penalties and interest. The Taxes are secured by a lien on Debtor's real property ("Property") pursuant to California Revenue & Taxation Code § 2192.1. Debtor's plan provides for monthly payments to the County at the rate of $59 per month, with interest computed at 4.3% per annum.

Debtor alleges the fair market value of her Property is $260,000. In addition to the Taxes, Debtor owes Fairbanks Corporation the sum of $179,903, and another creditor $3,000, both of whom hold secured interests in the Property with a first and second trust deed respectively.

Debtor's Statement of Income & Expenses indicates that her net monthly income is $1,901.97. She also receives supplemental contributions to her income from her 21 year old son and 68 year old father in the amounts of $465 and $1,000 per month respectively. Debtor lists her expenses at $2,927.40 per month, leaving Debtor approximately $440 per month in disposable income to fund her plan. The term of the plan is approximately 38 months.

### DISCUSSION

This case is a sequel to *In re Williams,* 273 B.R. 834 (Bankr.S.D.Cal.2002). Unlike *Williams,* County concedes in this case that the interest rate should be based on a market rate of interest, rather than the 18% statutory rate set forth in California Revenue & Taxation Code § 4103.

### A. DETERMINATION OF INTEREST RATE

Section 1325(a)(5)(b)(i)(ii) provides in pertinent part:

(a) except as provided in subsection (b), the court shall confirm a plan if—

\* \* \* \* \* \*

(5) with respect to each allowed secured claim provided for by the plan—

\* \* \* \* \* \*

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim

---

1. This is the second time in the last two years that Debtor has filed for protection under Chapter 13.

is not less than the allowed amount of such claim.

11 U.S.C. § 1325(a).

Debtor contends the appropriate rate of interest in this case is 4.3%; County contends it should be 10%.

## B. THE MARKET APPROACH

■ The Ninth Circuit has endorsed the market rate approach in determining the cramdown interest rate. *In re Fowler,* 903 F.2d 694, 697 (9th Cir.1990). The market rate approach is applicable to deferred tax payments owed to governmental entities. *In re Camino Real Landscape Maint. Contractors,* 818 F.2d 1503 (9th Cir.1987).

### 1. *Methods of Determining a Market Rate*

"Cases differ drastically in their interpretation of how a 'market' rate is to be determined." *Fowler,* 903 F.2d at 697. One approach requires the court to determine the current market interest rate for similar loans in the region (the "similar loan approach"). "Under this approach, the court sets the cramdown rate by taking testimony on current market rates regarding loans for the length of time involved secured by the type of property involved." *Id.*

Another approach is the formula approach. Under this approach, "the court starts with a base rate, either the prime rate or the rate on treasury obligations, and adds a factor based on the risk of default and the nature of the security (the 'risk factor')." [2] *Id.*

Debtor's expert uses the formula approach, while County's expert urges the Court to adopt the similar loan approach.

### 2. *Debtor's Expert Uses Formula Approach*

Debtor's expert, George Dell ("Dell"), utilized the formula approach in arriving at his market rate. As a base rate, Dell chose the prime interest rate which was 4.25% at the time of the hearing in this matter.[3] Dell testified that an interest rate is composed of three components: (a) the risk free rate, (b) the expectation of inflation in the market; and (c) the risk of loss. According to Dell, the prime interest rate [4] forms a good market approximation of the sum of "(a)" and "(b)." Dell opined that component "(c)", the risk of loss, on an individual residential property must be calculated from the potential loss of the entire property and is different from the sum of "(a)" and "(b)".

Dell focused on the "risk factor" to the County. Dell noted, and the parties concede, that Taxes owed to the County are treated specially pursuant to California's statutory scheme. The County has a first priority lien and is paid before every other creditor, including consensual lienholders. Dell then took into account that the ar-

---

**2.** The risk of default is only one aspect of the "risk factor." The nature of the security must also be taken into account.

**3.** The prime interest rate is higher than the rate on treasury obligations, which is the government's cost of borrowing. The court in *Camino Real* noted that "this rate is usually quite low because to the lender the government's obligation is a short-term, low risk investment. The obligation of a private borrower is quite different; its creditworthiness is not the same as the federal government's."

The court further noted that the treasury rates may be relevant, but not the same as the § 1129(a)(9)(C) rate. *In re Camino Real Landscape Maint. Contractors,* 818 F.2d 1503, 1506 (9th Cir.1987).

**4.** The Court agrees that the prime rate is appropriate to use as a base rate in the formula approach. The prime rate is a readily available figure and is easy to compute. Therefore, its use should minimize the need for litigation and expert testimony.

rears owed to the County are $1,932.03 and that the market value of the Property is $260,000. He concluded given the loan to value ratio, the Property would need to become near worthless before the County experienced a loss. Dell stated that either severe hazardous contamination or homes being washed into the ocean are examples where a residential property could lose its total value. He opined that total loss of value to a residential property will only occur in rare cases. Thus, Dell calculated the risk of total loss to the County at .01%.

Adding the prime interest rate to the risk factor, Dell concluded that the appropriate market interest rate in this case was 4.26%.

On cross-examination, Dell conceded that his analysis regarding the appropriate interest rate was based on the attributes of the collateral and not the Debtor. He conceded that he had not reviewed Debtor's bankruptcy schedules and statement of financial affairs and was unaware that Debtor had filed a prior chapter 13 in June 2000. Dell testified that he did not consider this information relevant to his analysis. [Transcript dated December 13, 2002, 8:1–2; 13:9–12]. Accordingly, Dell did not consider the risk of default in his analysis.

### 3. *County's Expert Uses the Similar Loan Approach*

In contrast, County's expert, Robert A. Taylor ("Taylor"), based the County's interest rate on similar loans in the region. Taylor affirmed that Taxes have a first priority position on Debtor's Property, but collection of the Taxes could only be enforced by the actual sale of the Property. Taylor testified that a sale could be achieved by way of public auction which may only occur five years after the tax has first become delinquent. In other words, the County must wait six years after the tax is first accrued to collect on the obligation. Taylor therefore concluded that the obligation to County most closely compares to a loan for a term of six years secured by a first deed of trust against the primary residence of the borrower.

He conceded that the loan to value ratio in this case is less than .01%. Taylor also opined that the Debtor is a subprime borrower.

Taylor testified that during the period from November 13–19, 2002, the annual percentage rate charged on a thirty year fixed loan secured by a first trust deed averaged approximately 5.85%. However, the rates and fees which he obtained in his analysis were quoted on a $150,000 loan with an 80% loan to value ratio offered to consumers with good credit characteristics. According to Taylor, if these loans were adjusted to provide for amortization over a five year time period, then the annual percentage rate increases to approximately 9.4%. [Taylor Decl. ¶ 11].

Additionally, Taylor's office conducted a telephone survey of thirteen lending institutions in San Diego to determine whether an individual with the Debtor's credit characteristics would be able to obtain a loan secured by a first trust deed. Of the institutions surveyed, only two indicated they would consider such a loan, and the decision to do so would be based on the specific circumstances of the borrower. Only one institution, Southwest Bank, provided a rate of 10%, excluding fees and costs for a five year loan. [Taylor Decl. ¶ 14].

Taylor testified that considering the secured position of the County relative to the alleged value of the Property, his research indicated that it would be very difficult for Debtor to obtain a loan because of 1) the uncertainty of the Debtor's ability to make the required payments; 2) the *small amount of the loan;* and 3) the recent

Chapter 13 bankruptcy (emphasis added). [Taylor Decl. ¶ 16].

Taylor concluded that the market interest rate to the County should not be less than 10% for several reasons. First, Debtor's poor credit condition. Next, Taylor opined that there was a substantial risk of default since Debtor relied on her father and son to help meet her monthly obligations. Lastly, Taylor considered current market interest rates available to borrowers with good credit and reasonable collateral.

## C. THE COURT CONCLUDES THAT IN THIS CHAPTER 13 CASE THE FORMULA APPROACH IS MORE ACCURATE

■ After considering the testimony, cross-examination, and argument from both parties, the Court concludes that the formula approach is the better of the two methods for determining a market rate of interest in cramdown situations such as this.[5] The approach urged upon by County is unnecessarily unwieldy and arbitrary because it examines market rates in a hypothetical market.

Taylor's testimony demonstrated how difficult it is to arrive at an appropriate interest rate using the current market interest rate for similar loans in the region. The 5.85% annual percentage rate that Taylor started his analysis with was based on annual percentage rates charged on thirty year fixed mortgages secured by a first trust deed. The rates and fees were quoted on an $150,000 loan with an 80% loan to value ratio. Taylor's testimony

regarding his telephone survey also revealed that very few lenders would be willing to make a loan to a borrower with Debtor's characteristics.

County relies heavily on *Fowler*, 903 F.2d at 697. In *Fowler*, a Chapter 12 debtor was attempting to cramdown a loan owed to the Farm Credit Bank in the amount of $159,000 on two thirty-five year variable rate promissory notes and a loan owed to Production Credit Association in the amount of $22,000 on a one year note. There was ample evidence before the *Fowler* court regarding the current market rates for loans at the length of time involved on farm property in Montana.

In contrast, Debtor's obligation to County has unique aspects that make comparisons to similar loans in the region difficult. Debtor's obligation to County for her Taxes involves a small amount and will be paid in a relatively short time. The small amount and short time period involved does not typically arise in the market examined by Taylor.[6] Finally, although few lenders would lend to borrowers with the characteristics of Debtor, in reality the risk of default, one aspect of the "risk factor" is de minimis given the chapter 13 process.

■ This Court noted in *Williams*, 273 B.R. 834, the "risk of default" is minimized in a chapter 13 case, given the protections that creditors enjoy under chapter 13 of the Bankruptcy Code. *Id.* at 838 (citations omitted). Specifically, chapter 13 debtors must show that they are financially able to make all their payments under the pro-

---

**5.** The use of a formula should only be a presumption, and the courts should always allow the parties to introduce evidence of market rates to rebut the presumption. *Fowler*, 903 F.2d at 698 (citations omitted). The Court has allowed the County to introduce evidence of market rates to rebut the presumption.

**6.** *See In re Villa Diablo Assocs.*, 156 B.R. 650, 655 (Bankr.N.D.Cal.1993) ("There is...no market which can quote terms for...the 'cram down' loans Congress provided for in [c]hapters 11, 12 and 13 of the Bankruptcy Code").

posed plan. Also, creditors have an enhanced ability to access the debtor's ability to service their debt, and wage orders can be used in Chapter 13's, to eliminate the risk of debtors defaulting on their monthly plan payments. Finally, the cost of collection is eliminated in a chapter 13 proceeding and the costs of administration are largely borne by the chapter 13 trustee.

Even though *Fowler* relied heavily on the similar loan approach, the court's risk of default analysis can be applied when using the formula approach. The Ninth Circuit in *Fowler* noted that in assessing the "risk of default", the risk is reduced to some extent in Chapter 12 plans because the trustee oversees the affairs of the debtor and the administrative and collection costs are lower. *Fowler*, 903 F.2d at 697. The Circuit also noted that confirmation of the Chapter 12 plan implies that the debtors have convinced the bankruptcy judge that the plan is feasible and the fact that the plan overcame such a hurdle heightens the probability of repayment. *Id.* Even though *Fowler* involved a Chapter 12 plan, the test for confirmation of Chapter 12 and 13 plans is almost identical.

As of the date of this hearing, Debtor was current on her payments to the chapter 13 trustee. Debtor's plan proposes to pay the County in full in approximately thirty-six months and she has already made payments since July 16, 2002. Taylor testified that the County must wait six years after the tax is first accrued to collect on the obligation by holding a public auction. Yet, Debtor proposes to pay the County in full with interest well before County would be entitled to hold the public auction. The Ninth Circuit in *Fowler* noted that where the debt is long term, there is a higher "risk of default." *Id.* at 698. In contrast, the risk of default would be lower in this case since Debtor will pay County in a relatively short period of time.

Finally, Dell's testimony regarding the "risk factor" remains undisputed. Unlike Taylor, Dell focused on the nature of the security rather than the risk of default. The Court views the two aspects of the risk factor—the nature of the security and the risk of default—at two different ends of the spectrum for purposes of the risk factor analysis. In the circumstances of this case, because the risk of default is so slight, more weight properly goes to analyzing the nature of the security involved.

It happens, though, that in this case, the risk involved with the County's secured position in the Property, is also slight. The loan to value ratio is less than .01% and the obligation to the County is secured by property valued at $260,000. As Dell testified, unless the residence has severe hazardous materials contamination or literally falls off a cliff or washes out into the ocean, the risk of loss to County is de minimis.[7] County also enjoys a priority status on the Property and Dell testified there were no foreclosure costs involved. [Transcript dated December 12, 2002, 15:24–25].

Accordingly, the Court concludes that the formula approach lends itself to the unique aspects of a chapter 13 case where a debtor's tax obligation is small relative to the value of the property involved, and where the taxing authority has a statutory right to a first priority position above all other lienholders. Moreover, the Court

---

7. County's counsel argued that under the analysis in *Camino Real*, 818 F.2d 1503, the attributes of the creditor are irrelevant to the analysis in this case. This Court disagrees. Counsel's use of the phrase "attributes of the creditor" is simply another way of saying "the nature of the security" or the "risk factor" that the Ninth Circuit used in *In re Fowler*, 903 F.2d 694, 697.

concludes that an emphasis on the nature of the security, rather than the risk of default, is appropriate in a chapter 13 case when determining the "risk factor" under the formula approach. Thus, the 4.26% interest rate [8] is the suitable interest rate for this case.

### CONCLUSION

The Court finds that the appropriate market rate of interest is 4.26%.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The attorney for the Debtor is directed to file with this Court an order in conformance with this Memorandum Decision within ten (10) days from the date of entry thereof.

---

**8.** Debtor agreed to pay 4.3% through her plan.