**In re BIG HOOK LAND & CATTLE COMPANY, Debtor.**

**Bankruptcy No. 86–40635.**

United States Bankruptcy Court, D. Montana.

Sept. 4, 1987.

Leo Graybill, Jr., Great Falls, Mont., for debtor.

John P. Paul, Great Falls, Mont., for PCA.

Malcolm Goodrich, Billings, Mont., for FLB.

Dunlap and Caughlan, Butte, Mont., trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Hearing on confirmation of the Debtor's Chapter 12 Plan was held on June 18, 1987, together with objections filed by Farm Credit Services, formerly Federal Land Bank of Spokane (FLB), and Milk River Production Credit Association (PCA). The Debtor made revisions to the Plan post-hearing and all parties in interest have submitted memorandums in support of their respective positions dealing with the issues of market rate of interest, sale of cattle, feasibility, and treatment of the unsecured creditors class.

The parties have stipulated that the value of the land (480 acres) and buildings or improvements is $89,800.00. FLB has a first mortgage lien on that property to secure payment of its present debt of $54,768.31 (as of 6/18/87). The debt accrues interest at a variable contract rate presently fixed at 12¼% and is now current. Under the Plan the Debtor proposes to pay interest and some principal through November, 1990, when the debt will then be $63,865.00, which is proposed to be repaid over 20 years at 10% interest. FLB contends the market rate of interest should be 12¼%, which is the tier 3 rate of interest now being charged high risk borrowers of FLB. The Plan states that from November 1, 1987, the FLB note will accumulate interest at the contract rate, be modified as of November 1, 1990, to 10% interest and all other interest due would be discharged. The Debtor thus seeks a breathing period of 3 years by reducing payments to FLB and PCA so that the Debtor can increase its small cow/calf operation of 35 to 96 cows.

PCA has a second lien on the land and improvements, and a first lien on livestock and equipment. PCA and Debtor agree that the value of its collateral is $58,585.00 and the debt due PCA as of June 1, 1987, was $144,462.00, thereby leaving PCA in an undersecured position. The Plan proposes to pay PCA "rent" on the land or value of its second lien ($25,935.00) in the amount of $1,096.00 per year for 3½ years until November 1, 1990, when the note of $25,935.00 will be repaid over 20 years at 10% interest per annum. The present contract rate of interest is 11.75%. On the balance of the PCA claim secured by chattels valued at $32,650.00, the Plan proposes to pay PCA $5,178.29 annually beginning November 1, 1987, over 10 years, at 10% interest per year.

Other secured creditors holding security, namely, GMAC, Village Bank and 1st Bank Havre, will be paid out under the Plan over 4 years at 10% interest. Under the Debtor's liquidation analysis, if this were a Chapter 7 proceeding, unsecured creditors would receive no payments and thus the Debtor proposes that the $57,868.18 of unsecured debt plus the unsecured portion of the PCA claim ($85,877.00) receive no payments under the Plan. I note in the liquidation analysis that the Debtor, a Montana corporation, claims exemptions under Montana law of $3,300.00. In Montana, only an individual may claim exemptions, and thus that privilege is not accorded to a corporation.

The Debtor's payments under the proposed Plan for each year beginning November 1, 1987, total $13,373.53. Income and expense projections for the Plan term are as follows:

| Income | Expenses | Plan Payments | Net Income |
|---|---|---|---|
| 1987—$21,650.00 | $ 4,900.00 | $15,387.08 | $1,362.92 |
| 1988— 41,000.00 | 12,146.00 | 13,737.53 | 2,916.47 |
| 1989— 51,300.00 | 15,000.00 | 13,737.53 | 1,882.47 |
| 1990— 60,500.00 | 17,000.00 | 13,737.53 | 3,762.47 |

The Plan projects that the Debtor will secure an operating loan of $46,000.00, payable over 3 years. Thus, the principal and interest of that loan is proposed to be amortized by payments of $12,200.00 (1988), $20,600.00 (1989) and $26,000.00 (1990). The net income, or disposable income shown for each year beginning in 1987, is after payments of the operating loan. The Plan does not include payments as administrative expenses for attorneys fees, which are requested in the sum of $5,909.00. If that amount is approved by the court, approximately $4,013.00 of disposable income would be available to unsecured creditors.

■ FLB objections raise two principal issues, i.e., the Plan does not provide for cash payments to FLB which have a present value equal to the amount of its claim as required by § 1225(a)(5) and the Plan is not feasible, since all payments proposed under the Plan cannot be made. With regard to feasibility, the entire thrust of Debtor's Plan is to gradually build up its cattle herd over a 3 year period, but Debtor needs a substantial operating loan of $46,-000.00 to fund such endeavor. The Debtor has produced evidence that Belt Valley Bank will advance $6,000.00 for the 1987 season, but has shown no credible evidence that the additional $40,000.00 required will be secured from any lending source. In the opinion of the Court, without the loan of $40,000.00 in hand, the Plan is visionary.

· FLB's expert witness testified that the projected expenses especially in light of the proposal to increase the herd and payments to FLB over the 3 years of the Plan term are contrary to 1225(a)(5). The issue as to Plan payments to FLB and the requirement of 1225(a)(5) is brought in focus by comparing the projected Plan payments to FLB of $2,500.00 against the payment due under FLB's theory of $6,343.00, which is the amount required to amortize FLB claims over 20 years at 10% interest. The difference of $3,843.00 per year, if added to Debtor's other projected expenses and payments in 1988, would produce a deficit each year of the Plan. In addition, the Plan does not provide for equipment replacement, although the Debtor evidently feels that proper repair would maintain the equipment for 20 years. As to expenses, after the hearing on confirmation, the Debtor revised its expense figure to provide for increased feed costs due to increased herd, and then further increased the income to conveniently accommodate the increase in expenses. Finally, as to feasibility, after 1991, payments to FLB and PCA would increase to $10,408.00 from $3,596.00, or increase by $6,812.00. Certain secured creditors by 1990 would be paid in full, leaving a net increase in payments of $3,600.00. Assuming, as does the Debtor's manager of operation, that income and expense would remain level after 1990, the Debtor projects a net income in 1990 of $3,762.00, leaving an operating margin of only $162.00. Such computation assumes that the Debtor will have operating loan repayments of about $26,000.00 for each year. As the Debtor has no operating funds, and no reserve is projected by the Debtor without borrowing, the entire operation will fail for lack of adequate cash. In reviewing further the projected income figures, the Debtor states that it will sell 34 bulls in 1988, and 40 in each year of 1989 and 1990. No evidence is in the record from the Debtor on how the Debtor would be able to acquire the additional bulls for sale, which at $900.00 per head constitutes increased income of $6,000.00 per year. If those funds are not forthcoming, the Plan, by the Debtor's own figures, is not feasible.

■ As to the objection that the unsecured creditors will receive no dividends under the Plan, the objection has merit. A Chapter 12 Plan may provide that all payments to secured creditors will result in no disposable income. In this case, there is a small disposable income available according to the Debtor's figures, which I have rejected. I comment from *In re Danelson*, 77 B.R. 261, 264, 4 Mont.B.R. 214, 220 (Bankr.Mont.1987):

"The plan must be proposed in good faith and not by any means forbidden by law. § 1225(a)(3). * * * The good faith requirement brought forth a position in early cases under the 1978 Code that a plan lacked good faith if no dividend was to be paid to unsecured creditors. *In re Terry*, 630 F.2d 634 (8th Cir.1980); *In re Burrell*, 6 B.R. 360 (N.D.Cal.1980), rev'g 2 B.R. 65 (Bankr.N.D.Cal.1980). The pronouncements in these Chapter 13 cases were changed by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA), P.L. 98–353, which provides that the Plan must provide for payments to unsecured creditors from all of the Debtor's projected disposable income over the three-year period. § 1325(b)(1)(B). Section 1225(b)(1)(B) adopts the same rationale."

Here, accepting the Debtor's figures, the Plan does not commit the disposable income to payment of unsecured creditors.

■ FLB's objections that the Plan violates Section 1225(a)(5) of the Code is well taken. Under Section 1225(a)(5), the Plan must provide that each secured claimant will retain a lien on collateral securing the claim, and as of the effective date of the Plan, that claimant receive in value an amount not less than the allowed amount of the claim. The secured creditor must therefore receive under the Plan the present value of its allowed claim. In this case, FLB must receive $54,788.31, and if such receipt will be over a period of years, the creditor has the right to receive interest at a fair market rate so the creditor receives the present value of its claim. As held in *Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 127, 4 Mont.B.R. 290 (Bankr. Mont.1987):

"Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the allowed amount of the secured claim."

In the present case, the Debtor does not propose under the Plan to pay either secured creditor the present value of its secured claim. The "rent" provision is contrary to § 1225(a)(5) and would be allowable only on granting adequate protection on a motion for relief from stay under § 1205, which incorporates by reference § 362 of the Code. See *In re Monnier Bros.*, 755 F.2d 1336, 1340 (8th Cir.1985), discussed later in this Order. While § 361 has been replaced by the adequate protection provisions of Section 1205, which allows for reasonable rent as adequate protection, such provisions govern pre-confirmation proceedings, and may extend post-confirmation, as the Debtor proposes in this case, only if it represents payment of present value of the allowed claim. In sum, the Plan as proposed does not provide either secured creditor with the present value of its allowed secured claim.

■ The final issue, raised by PCA, is that upon sale of the livestock, all funds from the sale should be paid over to PCA, which holds the livestock as collateral for its loan. That argument is without merit. This issue was addressed in *In re Wobig*, 73 B.R. 292, 294 (Bankr.D.Neb.1987), which held:

"Debtor proposes to sell feeder pigs free and clear of such lien. The debtor proposes to use proceeds of such sale in the operation of the business which the Court finds as a fact means that Bank is deprived of its lien on those feeder pigs which are sold and deprived of its lien on the proceeds of such sales.

* * * * * *

Chapter 12 does not absolutely prohibit debtors from using the proceeds of sale of certain collateral. This Court believes that if the debtor can propose a plan which 'adequately protects' the interest of the creditor in the collateral, debtor may use such proceeds. This is no different than the standards for relief from the automatic stay under Section 362 and the standards for use of cash collateral under Section 363. Creditor must be protected, but if the creditor is protected, the Debtor is permitted to use cash collateral. The Court is aware that preconfirmation 'adequate protection' analysis may not be applicable to the interest of

the creditor, post confirmation. See *In re Monnier Brothers*, 755 F.2d 1336 at 1340, 41 (8th Cir.1985). However, if a plan is feasible and meets other confirmation requirements, the creditor only has a right to receive the allowed amount of its secured claim and retain a lien on collateral to the extent of the balance due on the allowed secured claim. Any other conclusion prohibits Chapter 12 reorganization of a livestock operation."

In sum, if the Plan was confirmable, PCA would be protected under the confirmation standards. To accept the argument of PCA would mean it would receive more than the present value of its secured claim. The argument is therefore rejected.

In conclusion, I determine the Plan is not feasible and does not comply with Section 1225(a)(5) or (6) of the Code.

IT IS ORDERED the Debtor's Plan is denied confirmation with leave to amend in 15 days, or this case will be dismissed.