In re Dale N. PADDOCK, Nina M. Paddock, Debtors.

Bankruptcy No. 87–40271.

United States Bankruptcy Court,
D. Montana.

Nov. 20, 1987.

Neal G. Jensen, Great Falls, Mont., for debtors.

John P. Paul, Great Falls, Mont., for FLBS.

Dunlap and Caughlan, Butte, Mont., Trustee.

ORDER

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 20th day of November, 1987.

Hearing was held on September 24, 1987, on confirmation of Debtors' Chapter 12 Plan, together with objection to the Plan by Federal Land Bank of Spokane (FLBS). At the close of trial, all parties were granted fifteen days to file briefs regarding their respective positions. The briefs have now been filed and this case is deemed submitted and ready for decision. Objections of FLBS concern issues of feasibility and

appropriate market rate of interest to determine present value of the FLBS claim.

The Debtors, as to the issue of market rate of interest, believe an interest rate of nine per cent (9%) should be applied to their long-term debt owed the Federal Land Bank of Spokane (FLBS). The FLBS, on the other hand, offered expert testimony that the "prevailing market interest rate" on its debt should be set at prime rate plus four percent. Impact of the applicable interest rate was shown by calculations made by the FLBS's expert witness, which showed that for every one percent increase from 9%, the increase in the yearly cost to the Debtors' Plan would be almost $10,-000.00 per year. Therefore, over $50,-000.00 in yearly Plan payments could be attributable to the determination of the appropriate interest rate. Needless to say, such increase directly impacts on the feasibility of the Plan.

The Plan, as proposed, calls for payments in the first three years of $45,983.70, and payments in years four and five of $44,828.70. In these payments, the FLBS's debt of $309,814.22 is to be paid off in twenty (20) years at 9%. Testimony from both the Debtor and FLBS's expert witness, Dr. Ken Casavant, showed that the Debtors' Plan (with the 9% interest rate) would leave the Debtors with money to be carried over from year to year in the Plan. The Plan projects disposable income of $3,300.00 to be paid to unsecured creditors ($1,100.00 per year), but with all disposable income committed to the Plan.

The first issue becomes what interest rate is reflective of the "market rate of interest" for a "present value of deferred payments". Is the Debtors' proposed rate of 9% per annum or the FLBS's rate of 13% (prime of 9% plus 4%) the proper market rate of interest? The Ninth Circuit Court of Appeals recently rendered a decision in three consolidated bankruptcy cases on the issue of "what rate of interest on deferred payments of federal taxes will provide the government with payments having a present value to the allowed amount of its claim as required by 11 U.S.C. § 1129(a)(9)(c)". *In re Camino Real Land*

*Maint. Contractors, et al.,* 818 F.2d 1503, 1504 (9th Cir.1987). The issue of present value is the same in the case *sub judice,* for, as the Circuit Court noted, " * * * Congress used the phrase 'value, as of the effective date of the plan' in other sections of the Bankruptcy Code that have nothing to do with a deferred payment of taxes" so that "Congress presumably intended the phrase to have a single meaning in all cases, including this one. *Neal [Neal v. U.S. Pharmacal Co.],* 789 F.2d [1283] at 1288–89 [8th Cir. (1986)]; *Southern States [In re Southern States Motor Inns],* 709 F.2d [647] at 651–52, N. 6 [11th Cir. (1983)]." *Id.* at 1506–07. All Circuit Courts, which have rendered a decision on the issue are in agreement that the proper market rate of interest must be decided on a case-by-case basis, from a rule which applies a rate "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security". *Id.* at 1504. This Court cited *Camino Real* in its October 28, 1987, decision, *In re Janssen Charolais Ranch, Inc. (Janssen II),* 83 B.R. 743, ___ Mont. B.R. ___ (Bankr.Mont.1987). Many points addressed in *Janssen* are applicable in the case *sub-judice:*

"*Camino Real* made other observations in adopting the 'open market' standard, namely, (1) the decision should be made by the Bankruptcy Court on a case-by-case basis, *Id.* at 1508; (2) the debtor's characteristics, i.e., the nature of collateral and risk, determine the rate not the creditor's characteristics, such as cost of money or loan costs, *Id.* at 1506; and (3) the standard of open market is adopted to determine the 'value' of the deferred cash payments, irrespective of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan, the latter being irrelevant under the Code. *Id.* at 1505, 1507, N. 2.

' * * * the government concedes in principle that the § 1129(a)(9)(c) rate should reflect the term of deferment of present use and risk of default, as affected by any security * * *.' *Id.* at 1507.

For example, *Camino Real* stated in approving a reduction of the rate due to the secured nature of the claim:

> 'The adjustment was proper because market interest rates are usually lower when a loan is secured. *See Neal,* 789 F.2d at 1288, N. 11.' *Id.* at 1507–08.

Admitting that the proper rule on interest rates is unanimous among the courts and text authorities, *Camino Real* nevertheless recognizes such 'Unanimity disappears upon application * * *'. *Id.* at 1505. *See,* e.g., *In re Orosco,* 77 B.R. 246, 252–56 (Bankr.N.D.Cal.1987), holding:

> 'A number of the secured claimants argue that debtor, being the subject of proceeding under Chapter 11 of the Bankruptcy Code and having the accompanying record of loan defaults, is not a qualified borrower under their standard lending practices and that this fact must be taken into account in the setting of the appropriate interest rate. In support of this contention, the creditors refer to the "debtor's characteristics" language in the *Camino Real* opinion. The Court does not read the Opinion in this manner. If this were the test, every Chapter 11 debtor would ipso facto be required to pay interest at a rate in excess of market rate without regard to the debtor's financial condition at the time of confirmation, the security, the term of deferment, or the risk of a future default, the very factors which the Ninth Circuit Court emphasized as being of primary relevance.'

*Orosco* engaged in an examination of the security and potential risks to the lender in fixing a variable rate of 1½% over a Bank of America reference rate. *Neal,* supra, 789 F.2d at 1286, however, held that since value is to be fixed 'as of the effective date of the plan', the statute contemplates the use of a fixed interest rate, as opposed to a variable rate, since a variable or floating rate is not capable of allowing for a determination of present value. A fixed rate is thus mandated by the Code. *In re Lewis Industries,* 75 B.R. 862, 4 Mont.B.R. 434, 444, N. 2 (Bankr.Mont.1987)." *Id.* 83 B.R. at 744, ___ Mont. B.R. ___.

The evidence presented in this case shows a market rate of interest between 9% and 13%. In applying the above test to the evidence in this case, this Court as in *Janssen II* finds the applicable rate of interest to be prime plus a risk factor of 1½%, based on the following reasoning. The prime rate of interest is now at 8¾%. The prime rate is a commercial lending rate which certainly has an impact on the open market. *In re Welco Industries,* 60 B.R. 880, 883 (BAP 9th Cir.1986). Dr. Casavant, the FLBS's expert witness, stated that he arrived at an interest rate of prime plus four percent, for long-term loan, based on a study of commercial lenders who were asked their rate of a agricultural borrower in their area of a high risk with poor credit history. There is a flaw in applying the results of this survey to a Chapter 12 Plan debtor. For a Chapter 12 Plan to be confirmed it has to be scrutinized and found feasible by the Bankruptcy Court. If the Plan is found feasible by the Court, then payments under it should have a low risk of default. As such, a high-risk, poor credit history, borrower's interest rate should not necessarily be applied to a Chapter 12 Plan Debtor. In *Matter of Doud,* 74 B.R. 865, 869 (Bankr.S.D.Iowa 1987), the Court addressed why a Chapter 12 Plan Debtor may have a low-risk factor:

> "Some of the same elements that reduce or eliminate risk in Chapter 13 cases are at work in Chapter 12 cases. The Chapter 12 trustee is charged with overseeing the affairs of the debtor thereby reducing the administrative and collection costs. *See generally* 11 U.S.C. Section 1202. Like Chapter 13, Chapter 12 requires that the court must make a feasibility determination. *See* 11 U.S.C. Section 1225(a)(6). Chapter 12 creditors therefore are offered a statutory presumption (albeit less sound in reality, as discussed below) of repayment upon confirmation. Also, application of a proper discount rate in a Chapter 12 setting should not focus on any profit factor for creditors."

In a subsequent case, *In re John Martin*, 78 B.R. 593, —— Mont.B.R. —— (Bankr. Mont.1987), this Court stated that it did "not necessarily agree that a commercial lender thrust into a reorganization case should be deprived of any profit on the restructured loan for that lender too must remain viable in order to insure available credit to all borrowers". In determining market rate of interest in *Martin*, this Court used a prime rate of interest which necessarily covers all matters of bank's requirements and assessed a risk factor to fix the market rate. In essence, this approach is not unlike the approach of a commercial bank, as explained by Dr. Casavant.

In this Court's recent decision of *In re Foster*, 79 B.R. 488, —— Mont.B.R. —— (Bankr.Mont.1987), this Court addressed a second problem in applying Dr. Casavant's survey to Chapter 12 Plan debtors.

"The survey question did not reveal that the debtor was a Chapter 12 debtor, no institutional lenders such as FLB or Farmers Home Administration (FMHA) were included,[3] private Contract for Deed rates were not examined or considered, and finally the lenders were not asked directly if they were in fact making agricultural loans. The latter element was stressed by the Debtors from testimony developed from their real estate broker and mortgage broker that no institutional lenders in the Bozeman area were making agricultural loans, so that no commercial lending market has been established on interest rates."

Footnote 3 states:

"Indeed, the expert witness correctly stated he already knew the FLB rate and FMHA's rates would not be reflective of a true commercial market for agricultural debt. Due to the unique nature of FLB, I conclude the same is true for that cooperative, which is restricted by law to making only agricultural loans. Moreover, the annual report (1988) of the Farm Credit Administration states that '[L]ending rates for each Farm Credit Bank and appreciation are based on the institution's financial position and operating conditions. In most cases, lending rates are adjusted regularly to reflect the actual cost of funds * * *'. Debtors' Ex. 11, P. 32. The average cost of funds for the Twelfth District, which includes Montana, at the end of 1986 was 10.27%. Yet, FLB loans money to its preferred customers at 9½% and to a high risk borrower at 12.5%."

Based on the evidence in *Foster* this Court concluded "that the commercial interest rate from banks or insurance companies is non-existent due to the lack of lending activity". In the case *sub-judice*, this Court concludes from the evidence presented that a commercial interest rate from lending institutions is again non-existent. The market seems to be set by private contract activity, which evidence showed ranged from 8% to 9% over twenty (20) years. Again, I wish to stress that this Court does not question and indeed accepts that *if* a commercial lender would make an agricultural loan, the rate may be at prime plus 3 or 4%. At the risk of being repetitious, the approach adopted by the Court is the same adopted by the commercial lender, except the Court, as it must, determines the risk factor. The risk factor must be determined by considering the nature of the security and feasibility of repayment so as to cover a risk of loss.

The FLBS's debt of $309,814.22 is undersecured, so there is a risk of loss associated with repayment of a loan which is 100% leveraged, i.e., has no equity cushion. I conclude a risk factor of 1½% above prime of 8¾% will meet the market rate standard. The Court also points out that a restructured loan with the FLB could extend to a period of up to 35 years, which is the duration of loans set in the market by FLBS. This Court finds the market rate of interest in this case is to be set at prime (8¾%) plus 1½%, or 10¼%.

Since the Debtors' Plan does not address the debt owed to the FLBS at a 10¼% interest rate, the Plan as proposed cannot be confirmed on the issue of feasibility. That determination will await another day.

IT IS ORDERED that the Debtors' Chapter 12 Plan is denied confirmation, with

leave of the Debtors to amend the Plan within ten (10) days of this Order.