In re John E. FOWLER d/b/a Wyola Creek Ranch, Debtor.

Bankruptcy No. 87-40073.

United States Bankruptcy Court, D. Montana.

Dec. 23, 1987.

James A. Patten, Billings, Mont., for debtor.

Gregory G. Murphy, Billings, Mont., for FLB.

Edmund P. Sedivy, Jr., Bozeman, Mont., for Joyce M. Fowler.

Peder Moe, Jr., Billings, Mont., for PCA.

Dunlap and Caughlan, Butte, Mont., trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 12 case, hearing on the Debtor's Third Amended Plan was held on June 30, 1987, together with objections filed by Federal Land Bank of Spokane (FLB), Joyce M. Fowler (Fowler) and Interstate Production Credit Association (PCA). At a prior hearing, the Court determined that the value of the Debtor's land and improvements was $125,595.00, and it is on the basis of that valuation that the Debtor seeks to restructure his debts. Issues raised by the objections of creditors include (1) the applicable market rate of interest to determine whether the Plan satisfies § 1225(a)(5), (2) priority of Fowler's judgment lien over the FLB mortgage, and (3) feasibility of the Plan.

The Debtor's property consists primarily of agricultural property in Big Horn County, Montana, approximately 1,000 acres with improvements, which this Court has found to have a value of $125,595.00, approximately 30 head of livestock valued at $12,000.00, machinery valued at $21,500.00, inventory valued at $24,000.00, tools and supplies valued at $9,100.00 and exempt items valued at $3,000.00.

The Debtor is indebted to the FLB which is secured by two mortgages on real property filed of record on October 18, 1979 and June 9, 1982, to secure two promissory notes. In addition, the Midland Production Credit Association and Little Horn State Bank hold security interests in the Debtor's machinery, inventory and livestock. The creditor Fowler, former wife of the Debtor, is owed $28,370.00 based on a judgment in the divorce action entered October 20, 1981. The unsecured debt totals $68,767.79.

The Debtor operates a small ranching operation and supplements his income with custom hay cutting and mechanic work. The Debtor also runs cattle on shares whereby he retains a portion of each year's calf crop.

The Debtor proposes a five year Chapter 12 Plan. Past due property taxes will be paid over this period as will be payments to the unsecured creditors. The Midland Production Credit Association and the Little Horn State Bank secured debts will be paid over a seven year period bearing interest at 9½% per annum. The debt of the FLB will also bear interest at the rate of 9½% per annum and will be paid over a 25 year period with a partial deferral of interest during the first three years. The deferral of interest results in a negative amortization of the debt during that term as follows:

| | |
|---|---|
| 1. Beginning principle due FLB | $126,000.00 |
| Interest year 1 at 9½% | 11,970.00 |
| Interest paid year 1 | 3,444.00 |
| Additional interest accrual | 8,526.00 |
| 2. Principal ($126,000 + $8,526) | 134,526.00 |
| Interest year 2 at 9½% | 12,779.77 |
| Interest paid year 2 | 6,790.00 |
| Additional interest accrual | 5,989.97 |
| 3. Principal ($134,526 + $5,989.97) | 140,515.97 |
| Interest year 3 at 9½% | 13,349.02 |
| Interest paid year 3 | 9,790.00 |
| Additional interest accrual | 3,559.02 |
| 4. Principle ($140,515.97 + $3,559.02) | 144,074.98 |
| Amortized at 9½% at 22 years | 15,838.16 |

The value of the Debtor's unsecured assets is $11,057.00 and he proposes to pay this sum to the unsecured creditors over the life of the Plan with annual payments thereon being $2,211.40.

The Debtor has submitted a liquidation analysis setting forth the basis for the

sums to be paid to the creditors. That analysis shows the Plan satisfies § 1225(a)(4) of the Code.

The Plan provides for the following payments to creditors:

| First Year | – | $14,472.03 |
|---|---|---|
| Second Year | – | 17,985.33 |
| Third Year | – | 21,135.33 |
| Fourth and Fifth Years | – | 24,485.73 |

These payments are to be distributed to the creditors and for Trustee's fees and expenses, according to the following schedule:

| Year 1 – | Real Property Taxes | – | $ 974.42 |
|---|---|---|---|
| | FLB | – | 3,444.00 |
| | PCA | – | 4,644.34 |
| | Little Horn Bank | – | 2,508.73 |
| | Unsecured creditors | – | 2,211.40 |
| Year 2 – | Taxes | – | 974.42 |
| | FLB | – | 6,790.00 |
| | PCA | – | 4,644.34 |
| | Bank | – | 2,508.73 |
| | Unsecured creditors | – | 2,211.40 |
| Year 3 – | Taxes | – | 974.42 |
| | FLB | – | 9,790.00 |
| | PCA | – | 4,644.34 |
| | Bank | – | 2,508.73 |
| | Unsecured creditors | – | 2,211.40 |
| Year 4 – | Taxes | – | 974.42 |
| | FLB | – | 15,838.00 |
| | PCA | – | 4,664.34 |
| | Bank | – | 2,508.73 |
| | Unsecured creditors | – | 2,211.40 |
| Year 5 – | Taxes | – | 974.42 |
| | FLB | – | 15,838.00 |
| | PCA | – | 4,644.34 |
| | Bank | – | 2,508.73 |
| | Unsecured creditors | – | 2,211.40 |

PCA and Little Horn State Bank will be paid in full at the end of seven years, and each secured creditor will retain its present lien on collateral.

■ As to the issue between FLB and Fowler on priority of the mortgage over the judgment, I hold the FLB has a first mortgage position on the land and improvements, and since the amount of FLB debt exceeds the value of the real property, Fowler's claim is unsecured. The claim of FLB is based on two promissory notes. The first note is dated October 9, 1979, in the principal amount of $55,000.00 payable with interest at the variable rate of FLB as set in accordance with the provisions of the Farm Credit Act of 1971 and the regulations of the Farm Credit Administration. The second note is dated June 1, 1982, and is in the principal amount of $85,000.00 payable with interest at the FLB variable rate. Both notes were payable in annual installments. The final installment under the 1979 note was due November 1, 2014. The final installment under the $85,000.00

note was due January 1, 2017. Both notes are secured by real estate mortgages which were executed and recorded contemporaneously with the execution of the notes. In May, 1986, a parcel of property covered by the mortgages was released as a result of the sale of the parcel. The testimony at the hearing on confirmation was that all monies from the sale were applied on the FLB debts.

The Fowler Proof of Claim is based on a judgment for support and maintenance entered in Gallatin County, Montana, on October 20, 1981, in the sum of $20,000.00. The judgment lien of Fowler was recorded in Big Horn County, the location of Debtor's real property, on October 22, 1982, being after the date of the recording of the two FLB mortgages on October 18, 1979 and June 9, 1982. Fowler contends that a mortgage reamortization agreement was recorded in 1984, and by such fact, the judgment advanced ahead of each mortgage. That argument is without merit. The reamortization agreement merely changed the amount of repayment of the 1982 note and specifically preserved the mortgage lien filed June 9, 1982. Under the doctrine of first-in-time, first-in right, FLB has a valid prior lien on the real property.

■ The question of interest rates has been addressed in several recent Chapter 12 cases, among which is *In re Paddock*, 81 B.R. 51, —— Mont. B.R. —— (Bankr. Mont.1987), where the Court held in relying on *In re Camino Real Land Maint. Contractors, et al.*, 818 F.2d 1503 (9th Cir. 1987):

"* * * Congress used the phrase 'value as of the effective date of the plan' in other sections of the Bankruptcy Code that have nothing to do with a deferred payment of taxes, so that 'Congress presumably intended the phrase to have a single meaning in all cases, including this one. *Neal [Neal v. U.S. Pharmacal Co.]*, 789 F.2d [1283] at 1288–89 [8th Cir. (1986)]; *Southern States [In re Southern States Motor Inns]*, 709 F.2d [647] at 651–52, N. 6 [11th Cir. (1983)]." *Id.* at 1506–07. All Circuit Courts, which have rendered a decision on the issue are in

agreement that the proper market rate of interest must be decided on a case-by-case basis, from a rule which applies a rate 'the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security'. *Id.* at 1504. This Court cited *Camino Real* in its October 28, 1987, decision, *In re Janssen Charolais Ranch, Inc. (Janssen II)*, —— Mont. B.R. ——, 83 B.R. 743 (Bankr. Mont.1987). Many points addressed in *Janssen* are applicable in the case *sub judice:*

> '*Camino Real* made other observations in adopting the "open market" standard, namely, (1) the decision should be made by the Bankruptcy Court on a case-by-case basis, *Id.* at 1508; (2) the debtor's characteristics, i.e., the nature of collateral and risk, determine the rate not the creditor's characteristic, such as cost of money or loan costs, *Id.* at 1506; and (3) the standard of open market is adopted to determine the "value" of the deferred cash payments, irrespective of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan, the latter being irrelevant under the Code. *Id.* at 1505, 1507, N. 2.
>
> " * * * the government concedes in principle that the § 1129(a)(9)(c) rate should reflect the term of deferment of present use and risk of default, as affected by any security * * *." *Id.* at 1507.

For example, *Camino Real* stated in approving a reduction of the rate due to the secured nature of the claim:

> "The adjustment was proper because market interest rates are usually lower when a loan is secured. *See Neal,* 789 F.2d at 1288, N. 11." *Id.* at 1507–08. Admitting that the proper rule on interest rates is unanimous among the courts and text authorities, *Camino Real* nevertheless recognizes such "Unanimity disappears upon application * * * ". *Id.* at 1505. *See,* e.g., *In re Orosco,* 77 B.R. 246, 252–56 (Bankr. N.D.Cal.1987), holding:

> "A number of the secured claimants argue that debtor, being the subject of proceeding under Chapter 11 of the Bankruptcy Code and having the accompanying record of loan defaults, is not a qualified borrower under their standard lending practices and that this fact must be taken into account in the setting of the appropriate interest rate. In support of this contention, the creditors refer to the 'debtor's characteristics' language in the *Camino Real* opinion. The Court does not read the Opinion in this manner. If this were the test, every Chapter 11 debtor would ipso facto be required to pay interest at a rate in excess of market rate without regard to the debtor's financial condition at the time of confirmation, the security, the term of deferment, or the risk of a future default, the very factors which the Ninth Circuit Court emphasized as being of primary relevance."
>
> *Orosco* engaged in an examination of the security and potential risks to the lender in fixing a variable rate of 1½% over a Bank of America reference rate. *Neal,* supra, 789 F.2d at 1286, however, held that since value is to be fixed "as of the effective date of the plan", the statute contemplates the use of a fixed interest rate, as opposed to a variable rate, since a variable or floating rate is not capable of allowing for a determination of present value. A fixed rate is thus mandated by the Code. *In re Lewis Industries,* 75 B.R. 862, 4 Mont. B.R. 434, 444, N. 2 (Bank. Mont.1987)' " *Id.* 81 B.R. at 52–53.

The FLB presented testimony from Washington State University professor Dr. Kenneth Duft, that he and his colleague Dr. Casavant, had conducted a telephone survey of active agricultural lenders in a four state area and determined that such lenders had an average fixed interest rate of prime rate plus 4 per cent on long term agricultural loans. That testimony has been presented in several Chapter 12 cases. *See, In re Foster,* 79 B.R. 906, 5 Mont. B.R. 108, 120–121 (Bankr.Mont.1987); *In re Cool,* 81 B.R. 614, 620–21, —— Mont.B.R.

———, (Bankr.Mont.1987); *In re Paddock*, 81 B.R. 51, 54, —— Mont.B.R. —— (Bankr. Mont.1987). As stated in *Paddock:*

"At the risk of being repetitious, the approach adopted by the court is the same adopted by the commercial lender, except the court, as it must, determines the risk factor. The risk factor must be determined by considering the nature of security and feasibility of repayment so as to cover a risk of loss."

Each case is to be decided on a case-by-case basis. I again adopt the prime rate of interest as the base rate, which is presently 8¾% and add to such base rate a factor of ¾%, to fix the applicable market rate of interest at 9½%. The risk factor is fixed by reason of the fact that the Debtor's testimony shows the Plan payments can easily be made to the secured creditors as proposed, and thus the risk of default is minimal. Further, PCA is fully secured on its debt.

■ Utilizing the interest rate of 9½%, it is evident that both the FLB and the Midland Production Credit Association will receive a stream of payments with a present value equivalent to their present secured claim. While the FLB will receive partial interest payments during the first three years of the Plan, as set out above, the deferred interest will be accumulated and the total accumulated sum including principal will be amortized over the remaining 22 years. I find such Plan proposal satisfies the requirements of § 1225(a)(5) of the Code.

■ The FLB and PCA have also challenged the feasibility of the Debtor's proposed Plan. The Debtor testified that he would be able to make the Plan payments as well as the required five per cent Trustee's fee. Debtor's exhibit of income, expense and Plan payments shows his projected cash flow. To a limited and insignificant extent, the Debtor's cash flow shown on the exhibit differs slightly from his testimony and upon review would appear to reflect a slight shortfall of cash during the first several years of the Plan. Upon close analysis, however, it is evident that the proposed Plan is feasible. I apply the language from *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985):

"Projecting future incomes of, and expense of, on extensive farming operation such as debtors' cannot be an exact science."

Essentially, the Debtor's proposed Plan is to defer complete payments to the FLB during the first three years of the Plan so as to build his cattle herd and starting in year four, amortize the accumulated principal and interest. The amount deferred during the first three years will be devoted to the purchase of cattle and will increase his income thereby rendering the Debtor's Plan feasible.

Debtor's exhibit did not include the Trustee's fees and in that respect his Plan payments are slightly less than his Plan payments as proposed in his Third Amended Chapter 12 Plan. Essentially, the increased Plan costs for the Trustee's fee will prevent the Debtor from purchasing one cow the first year, an additional cow the second year, and an additional two cows the third year. As a result by the third year, the Debtor will have less calves to sell thus reducing his gross income. However, this reduced income will be approximately $742.00 in the fourth year. It should be noted that Debtor's exhibit takes into account the contingency that Debtor will not be able to acquire the requisite number of cattle. The exhibit budgets an expenditure to acquire ten cows per year for the first three years, yet at year four, the Debtor projects an increase of only 28 cattle. Thus Debtor's exhibit already includes a contingency of having two less cattle than his budgeted purchases.

The first year the Debtor will be able to acquire nine additional cattle. However, in year 2, the Debtor's expenses will be increased slightly and instead of purchasing ten cows, the Debtor will be able to afford the purchase of nine cattle. In year three, the Debtor will have available for sale 58 calves instead of 59 and his projected income will be reduced by $371.00; this reduced income, when combined with his increased Plan costs, will allow the Debtor to

purchase only eight cattle instead of the ten projected. In year four, the Debtor will have 66 calves for sale and his gross income will be $742.00 less than that projected in the testimony. However, even with that reduced income, he will still have available $28,386.00 with which to make Plan payments of $27,485.00. Thus the Debtor's testimony that he will be able to make the required Plan payments is consistent with and not materially at odds with the Debtor's exhibit.

In his projected cash flow schedule, the Debtor's expenses are fully consistent with his historical costs. Debtor's tax returns have been submitted as an exhibit to the Court and reflect for years 1984, 1985 and 1986 operating costs, exclusive of interest and depreciation expense of $15,959.00, $11,592.00 and $16,766.00 respectively. Through the life of the Plan the Debtor projects expenses of $15,300.00 the first year, $15,300.00 the second year; $16,000.00 the third year, and $17,000.00 the fourth and fifth years. The Debtor's projection of expenses are realistic when compared to his historical experience. The Debtor's projected income is similarly consistent with his experience and with current market prices. The Debtor's projected income from the sale of calves is based on current market prices. The tax records submitted to the Court reflect an income from custom cutting and from mechanic work in the amounts of $9,832.00, $10,645.00 and $9,865.00 for the years 1984, 1985 and 1986 respectively. The Debtor projects income from these sources to be $10,000.00 the first year and $12,500.00 each year thereafter. In addition, the Debtor testified that his present wife will pay to him the sum of $8,400.00 per year for pasture rent of her herd. This testimony was substantiated by his wife. All matters considered on feasibility, I find the Plan is feasible and accurately portrays the ability to make all payments under the Plan.

After notice and hearing, I conclude the Debtor's Third Amended Plan complies with the provisions of Section 1225 of the Bankruptcy Code. Accordingly,

IT IS ORDERED:

(1) The Debtor's Third Amended Chapter 12 Plan is confirmed.

(2) The Debtor shall pay to the Trustee the sums provided for in the Plan at the times and amounts provided therein.

(3) Compensation of the Trustee is fixed at 5% of all payments made to creditors during the term of the Plan.

(4) Necessary and actual expenses of the Trustee shall be approved upon order of this Court.

(5) The value of collateral securing debts due holders of secured claims is fixed at the values stated in the Third Amended Chapter 12 Plan.

(6) Upon completion of the Debtor's Plan according to its final terms, all judgments and U.C.C. filings shall be satisfied.

(7) The Plan for good cause, is extended to a period of five years.

(8) This Order is subject to any objections filed within 15 days by any party in interest.