**In re BIG HOOK LAND & CATTLE COMPANY, Debtor.**

**Bankruptcy No. 86–40635.**

United States Bankruptcy Court, D. Montana.

Jan. 11, 1988.

Leo Graybill, Jr., Great Falls, Mont., for debtor.

John P. Paul, Great Falls, Mont., for PCA.

Malcolm Goodrich, Billings, Mont., for FLB.

Dunlap and Caughlan, Trustee, Butte, Mont.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

On September 4, 1987, the Court denied confirmation of the Debtor's Chapter 12 Revised Plan on grounds the Plan was not feasible, the Plan failed to commit the net disposable income, if any, to payment of unsecured claims, and the Plan did not propose to pay each secured creditor the present value of their allowed secured claim. *In re Big Hook Land & Cattle Co.,* 77 B.R. 793 (Bankr.D.Mont.1987). The Debtor then amended the Plan on September 18, 1987 (filed September 21, 1987) to provide for a change in operations by running of cattle on shares, which adds about $12,000.00 additional income to the operation annually, and proposes to pay Federal Land Bank of Spokane (FLB) and Milk River PCA (PCA) in full over 20 years at $10\frac{3}{4}\%$ interest per year. Hearing on confirmation of the Amended Plan, together with objections filed by FLB and PCA, was held on October 29, 1987. All parties have now submitted memorandums in support of their respective positions. PCA claims the Plan understates its secured claim, does not provide for payment of present value in accordance with § 1225(a)(5), disputes the interest rate proposed in the Plan as not being a market rate of interest, and contends the Plan is not feasible. FLB's objections are along the same line, except it concedes the Plan properly fixed the amount of its secured claim. The record developed at the confirmation hearing which led to the September 4, 1987, Order has been incorporated into the present record as well as the Court taking judicial notice that the prime rate of interest is now $8\frac{3}{4}\%$ (being 9% at the date of hearing).

In the Order of September 4, 1987, I noted that "PCA has a second lien on land and improvements, and a first lien on livestock and equipment. PCA and Debtors agree that the value of its collateral is $58,585.00 and the debt due PCA as of June 1, 1987, was $144,462.00, thereby leaving PCA in an undersecured position". Included in the valuation of $58,585.00 was livestock at $24,650.00. PCA now claims that the value of livestock under the Plan should be increased to $42,800.00, thereby increasing the PCA allowed secured claim to $75,792.00. The security agreement attached to PCA's Proof of Claim, grants PCA as collateral:

"All livestock, equipment and/or other goods of every kind and description now

owned or hereafter acquired by the debtor and wherever located * * *

* * * * * *

* * * all natural increases, additions, accretions and replacement of livestock. * * *."

The basis of PCA's argument is that the Plan calls for increases in the cattle herd over the four years of the Plan term and PCA should have its secured claim allowed in the amount of such increases post-petition. Debtor agrees with PCA that the carry-over cattle increase the herd, and therefore the production of Plan income, but the value as of confirmation will be $25,200.00 (as opposed to $24,650.00), and the calf crop from the herd is not part of PCA's collateral. In other words, the Debtor argues PCA is entitled to a valuation fixed on the basis of the present herd not the product of the herd. Debtor contends § 552 of the Code requires such result. The law is fairly well-settled on the interpretation of § 552 and is appropriately summarized in *In re Wallman*, 71 B.R. 125, 127–128 (Bankr.D.S.D.1987), as follows:

> "With certain exceptions, Bankruptcy Code Subsection 552(a) clearly provides that property acquired by the debtor or the bankruptcy estate *after* the filing of the petition is *not* subject to any lien resulting from an after-acquired property clause in a security agreement entered into *before* the filing of the petition. 11 U.S.C. § 552(a).[4] *See also In re Sheehan*, 38 B.R. 859, 863 (Bankr.D.S.D. 1984). The legislative history of section 552 states this proposition as follows:
>
> > Under the Uniform Commercial Code, Article 9 [9–204], creditors may take security interests in after-acquired property. This section governs the effect of such a prepetition security interest in postpetition property....
> >
> > As a general rule, if a security agreement is entered into before the case, then property that the estate acquires is not subject to the security interest created by the security agreement....

House Rep. No. 595, 95th Cong., 1st Sess. 376–77 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6332, 6333. Within given limits, Bankruptcy Code Subsection 552(b), however, excepts certain lien interests from the effect of subsection (a). *See* 11 U.S.C. § 552(b). Among other things, 'proceeds' are generally excepted under this provision. *Id.*

> * * * * * *

> Including this court, in *In re Sheehan*, 38 B.R. 859, 863 (Bankr.D.S.D.1984), several courts, in some form, have addressed the issue of whether Bankruptcy Code Section 552 extinguishes a creditor's otherwise properly perfected prepetition future crop security interest on crops which have been planted postpetition and have unanimously held that the prepetition lien does not attach to postpetition planted crops. *See In re Drewes*, 68 B.R. 153, 155 (Bankr.N.D. Iowa 1986); *In re Randall*, 58 B.R. 289, 290 (Bankr.D.C.Ill.1986); *In re Lorenz*, 57 B.R. 734, 736 (Bankr.N.D.Ill.1986); *In re Hugo*, 50 B.R. 963, 967 (Bankr.E.D. Mich.1985); *In re Hamilton*, 18 B.R. 868, 871 (Bankr.D.Colo.1982).

> The 'proceeds' exception in subsection (b) *only* refers to proceeds generated by prepetition collateral, *not* proceeds of after-acquired property. 11 U.S.C. § 552(b). *See In re Lorenz*, 57 B.R. 734, 736 (Bankr.N.D.Ill.1986). Proceeds of collateral may be held to be secured by a prepetition security interest only if the collateral which produces the proceeds was acquired by the debtor prepetition. *Id.*"

---

[4] Bankruptcy Code Subsection 552(a) reads as follows:

"Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

In accord: *In re Smith*, 72 B.R. 344, 349 (Bankr.S.D.Ohio 1987); *In re Grassridge Industries, Inc.*, 78 B.R. 978 (Bankr.W.D. Mo.1987).

In *Matter of Wobig*, 73 B.R. 292, 294–295 (Bankr.D.Neb.1987), the Court discussed the proceeds derived from the sale of offspring of a livestock feeder pig operation and held:

"There is obvious tension between the various sections of the Bankruptcy Code, including sections 552 and 1225. If the Court were to find that debtor with a livestock operation subject to security interests in livestock and the offspring of such livestock was unable to sell the livestock to fund an operating Chapter 12 plan because of the terms of Section 1225(a)(5)(B)(i), no 'family farmer' whose business was substantially a livestock operation would be able to obtain confirmation of a Chapter 12 plan of reorganization.

\* \* \* \* \* \*

The business of the debtor is raising and selling feeder pigs. The debtor owns certain sows which are subject to the security interest of the Bank. Debtor, through use of the labor and management skills and marketing skills, produces pigs that when fed to a certain size are sold. The proceeds of those sales are used in the ordinary course of business outside of bankruptcy to pay the operating expenses of the business and to make the payments to the Bank. Without the management services of the debtors, there would be no offspring. If there were no offspring, the Bank, in a liquidation setting, would receive no more than the value of the sows as they exist at this time."

Likewise in this case, the proceeds from the after-acquired cattle through shares or calf crop are devoted to the payment of the ranch expenses and allowed creditors' claims. When the calf crop is marketed in the ordinary course of business, it is from these after-acquired livestock proceeds, developed from management work and skill that the farmer relies upon to fund the Plan. In short, the proceeds are not from pre-petition collateral of PCA, but are clearly from proceeds of after-acquired property. As a result, I conclude the allowed secured claim of PCA is fixed at $58,585.00, which includes livestock at the date of the petition, valued at $24,650.00. PCA's contentions to the contrary are rejected.

■ The question of proper market rate of interest has been addressed in several recent Chapter 12 cases, among which is *In re Fowler*, 83 B.R. 39, ____ Mont.B.R. _____ (Bankr.Mont.1987), relying on *In re Camino Real Land Maint. Contractors, et al.*, 818 F.2d 1503 (9th Cir.1987):

"The question of interest rates has been addressed in several recent Chapter 12 cases, among which is *In re Paddock*, 81 B.R. 51, 5 Mont.B.R. 147 (Bankr.Mont. 1987), where the Court held in relying on *In re Camino Real Land Maint. Contractors, et al.*, 818 F.2d 1503 (9th Cir. 1987):

' \* \* \* Congress used the phrase "value as of the effective date of the plan" in other sections of the Bankruptcy Code that have nothing to do with a deferred payment of taxes, so that "Congress presumably intended the phrase to have a single meaning in all cases, including this one. *Neal [Neal v. U.S. Pharmacal Co.* ], 789 F.2d [1283] at 1288–89 [8th Cir.1986]; *Southern States [In re Southern States Motor Inns* ], 709 F.2d [647] at 651–52, N. 6 [11th Cir.1983]". *Id.* at 1506–07. All Circuit Courts, which have rendered a decision on the issue are in agreement that the proper market rate of interest must be decided on a case-by-case basis, from a rule which applies a rate "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security". *Id.* at 1504. This Court cited *Camino Real* in its October 28, 1987, decision, *In re Janssen Charolais Ranch, Inc. (Janssen II)*, ____ Mont.B.R. ____, 83 B.R. 743 (Bankr.Mont.1987). Many points addressed in *Janssen* are applicable in the case *sub-judice:*

"*Camino Real* made other observations in adopting the 'open market' standard, namely, (1) the decision should be made by the Bankruptcy Court on a case-by-case basis, *Id.* at

1508; (2) the debtor's characteristics, i.e., the nature of collateral and risk, determine the rate not the creditor's characteristics, such as cost of money or loan costs, *Id.* at 1506; and (3) the standard of open market is adopted to determine the 'value' of the deferred cash payments, irrespective of the financial burden a debtor would have to bear in order to obtain a hypothetical new loan, the latter being irrelevant under the Code. *Id.* at 1505, 1507, N. 2.

'* * * the government concedes in principle that the § 1129(a)(9)(c) rate should reflect the term of deferment of present use and risk of default, as affected by any security * * *.' *Id.* at 1507.

For example, *Camino Real* stated in approving a reduction of the rate due to the secured nature of the claim:

'The adjustment was proper because market interest rates are usually lower when a loan is secured. *See Neal,* 789 F.2d at 1288, N. 11.' *Id.* at 1507–08. Admitting that the proper rule on interest rates is unanimous among the courts and text authorities, *Camino Real* nevertheless recognizes such 'Unanimity disappears upon application * * *'. *Id.* at 1505. *See,* e.g., *In re Orosco,* 77 B.R. 246, 252–56 (Bankr.N. D.Cal.1987), holding:

'A number of the secured claimants argue that debtor, being the subject of proceeding under Chapter 11 of the Bankruptcy Code and having the accompanying record of loan defaults, is not a qualified borrower under their standard lending practices and that this fact must be taken into account in the setting of the appropriate interest rate. In support of this contention, the creditors refer to the "debtor's characteristics" language in the *Camino Real* opinion. The Court does not read the Opinion in this manner. If this were the test, every Chapter 11 debtor would ipso facto be required to pay interest at a rate in excess of market rate without regard to the debtor's financial condition at the time of confir-

mation, the security, the term of deferment, or the risk of a future default, the very factors which the Ninth Circuit Court emphasized as being of primary relevance.'

*Orosco* engaged in an examination of the security and potential risks to the lender in fixing a variable rate of 1½% over a Bank of America reference rate. *Neal,* supra, 789 F.2d at 1286, however, held that since value is to be fixed 'as of the effective date of the plan', the statute contemplates the use of a fixed interest rate, as opposed to a variable rate, since a variable or floating rate is not capable of allowing for a determination of present value. A fixed rate is thus mandated by the Code. *In re Lewis Industries,* 75 B.R. 862, 4 Mont.B.R. 434, 444, N. 2 (Bankr. Mont.1987)." *Id.* at ——.

The FLB presented testimony from Washington State University professor Dr. Ken Casavant, that he and his collegue Dr. Kenneth Duft, had conducted a telephone survey of active agricultural lenders in a four state area and determined that such lenders had an average fixed interest rate of prime rate plus 4 per cent on long term agricultural loans. That testimony has been presented in several Chapter 12 cases. *See, In re Foster,* 81 B.R. 614, 5 Mont. B.R. 108, 120–121 (Bankr.D.Mont.1987); *In re Cool,* 81 B.R. 614, 619–20, 5 Mont.B.R. 183 (Bankr.D.Mont.1987); *In re Paddock,* 81 B.R. 51, 53–54, 5 Mont.B.R. 147 (Bankr. Mont.1987). As stated in *Paddock:*

"At the risk of being repetitious, the approach adopted by the court is the same adopted by the commercial lender, except the court, as it must, determines the risk factor. The risk factor must be determined by considering the nature of security and feasibility of repayment so as to cover a risk of loss." *Id.* at 54, 5 Mont.B.R. at 153.

Each case is to be decided on a case-by-case basis. The Debtor presented evidence of a written loan agreement between Western Bank of Chinook, a commercial bank located in Debtor's area and two third party borrowers under date of May 1, 1987,

where the Bank loaned money at 10% per annum on a portion of the loan and 3% over prime on the balance of the loan. I deem such evidence indicative of the varying interest rates made by commercial banks. I again adopt the prime rate of interest as the base rate, which is presently 8¾%, and add to such base rate a risk factor of 2% as proposed by the Debtor to fix the applicable market rate of interest at 10¾%. The risk factor is fixed by reason of the fact that the Debtor's testimony shows the Plan payments are over an extended period of time, secured by adequate chattels and real estate, yet the risk of default demands an upward adjustment of the rate. The term of each payout of 20 years is reasonable in light of the nature of the secured parties' collateral and each party's current lending practice.

■ Utilizing the interest rate of 10¾%, it is evident that both the FLB and the Milk River Production Credit Association will receive a stream of payments with a present value equivalent to their present secured claim, even though the Plan has a negative amortization rate the first four years of repayment. While FLB and PCA will receive partial interest payments during the first four years of the Plan, the deferred interest will be accumulated and the total accumulated sum including principal will be amortized over the remaining 16 years. I find such Plan proposal satisfies the requirements of § 1225(a)(5) of the Code.

■ The FLB and PCA have also challenged the feasibility of the Debtor's proposed Plan. The Debtor's manager testified that it would be able to make the Plan payments as well as the required administrative expenses.

The Debtor is a small ranching operation in the business of raising exotic cattle—mainly Charlois. The bull calves are sold for breeding purposes and the heifer calf crop either held to increase the herd or sold in the fall. Beginning in 1985, the Debtor's operation suffered from drought in the area, which reflected significantly upon the expenses of operation since the Debtor's operation depends on purchase of hay for part of the year's feed. The Debtor has been able to keep the FLB loan current, but the PCA debt fell into arrears. The original Plan provided for a loan commitment of $6,000.00, which is still in place, but the revised Plan does not depend upon a bank loan to purchase more cattle. Rather, the Plan provides for share cattle to fill this income requirement. According to the Debtor, the share arrangement adds to the stability of the operation by including anticipated income from $20,000.00 annually to $32,750.00. Each year of projected income and expenses leaves the Debtor with a carryover income to fund the next year's operation. Debtor emphasizes that the entire Plan is based on average rainfall so as to keep the price of hay at the average cost of $35.00 per ton. Labor costs have been eliminated since an experienced ranch manager will manage the operation for his housing and grass for his personal cattle as compensation. In the event of unanticipated expenses, the loan commitment of $6,000.00 is available.

FLB and PCA argue the Debtor's statements on projected income and expense show a 167% increase in cattle numbers but no similar increase in expenses. Further, the Plan expenses are far below historical costs of operation. In that regard, the drought years caused substantial increase in hay purchases and if average rainfall is experienced, this change in operating conditions justifies the substantial reduction in expenses. While the machinery is old, it is in good repair, and no significant replacements are anticipated, even though FLB challenges such position. I adopt the Debtor's testimony as credible. It appears the principal item of difference in the expense analysis is the feed expense of hay. The Plan proposes to use 1.25 tons of hay per animal unit times 90 cattle times $40.00 a ton for a total of $4,500.00. The figure is challenged by PCA's senior loan officer, but I find his analysis faulty. The loan officer is critical of the hay price at $45.00 per ton, but the record reflects such a price of $35.00 to $40.00 per ton is the market price in a normal year. In sum, there is a rational basis for the projected expense on feed as testified by the Debtor's manager

of operations. One cannot compare drought years with normal years to estimate the next three to four years of operation when precipitation levels are now near or exceeding normal. As an example, the senior loan officer's expenses for 1986 included abnormal expense for feed ($10,-982.00), but if that 1986 year is adjusted to a normal year ($4,500.00), the projected expenses of operation would be less than $1,000.00 over the projected expenses for the next four years.

The language of *In re Hansen*, 77 B.R. 722, 727 (Bankr.D.N.D.1987), is appropriate.

"This Court has indicated on prior occasions that the benefit of the doubt in Chapter 12 cases will be given to farmers, if it appears that a reasonable chance of meeting their payments as projected under a plan. (sic).

\* \* \* \* \* \*

The Court believes that the inclement weather conditions of prior years have been wholly outside the control of the debtors, and that, assuming average weather conditions, the Debtors will be able to meet their income and expense projections."

As held previously by this Court, guaranteed success is not the test or standard. *In re Martin*, 66 B.R. 921 (Bankr.D.Mont. 1986).

I conclude from all the evidence, the Plan's projected income and expenses are reasonable, and therefore I hold the Plan is feasible. It must be assumed that the share arrangements are in place, for if they do not materialize, clearly the Plan will be subject to dismissal. I accept the Plan's projection that share cattle arrangement can be accomplished.

IT IS ORDERED after notice and hearing:

(1) The Debtor's Amended Chapter 12 Plan is confirmed;

(2) The Debtor shall pay the Trustee the sums provided for in the Plan at the times and amounts provided therein;

(3) Compensation of the Trustee is fixed at 5% of all payments made to creditors during the term of the Plan and compensation of the attorney for the Debtor is fixed at $2,000.00.

(4) Necessary and actual expenses of the Trustee shall be approved upon order of this Court;

(5) The value of collateral securing debts due holders of secured claims is fixed at the values stated in the Amended Plan;

(6) Upon completion of the Debtor's Plan according to its final terms, all judgments and U.C.C. filings shall be satisfied;

(7) The Plan for good cause, is extended to a period of four years;

(8) This Order is subject to any objections filed within 15 days by any party in interest.